**2:18–cv–03099**-DRH-GRB

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 𝔆𝔬𝔲𝔯𝔱

*for the*

# Eastern District of New York

**D.W.M.,** a minor by Willie Moore, his father, and Ursula Moore**,** his mother, **D.D.M,** a minor by Willie Moore, his father, and Ursula Moore**,** his mother, and **WILLIE MOORE** and **URSULA MOORE**,

*Plaintiffs*

*–v–*

**ST. MARY SCHOOL**,
**BIAGIO M. ARPINO**, *Principal of St. Mary School*, and
**THE ROMAN CATHOLIC DIOCESE OF ROCKVILLE CENTRE**,

**L.M., M.J.**, and **M.M.**, infants by their respective parents and natural guardians,

**KERRI LECHTRECKER**, individually and as the mother of **L.M.**, an infant, and **E.G.M.** (initials by Order of the Court), individually and as the father of **L.M.**, an infant;
"**MIKE" JONES** and **CHRISTINE JONES**, individually and as parents and natural guardians of M.J., an infant; and
**KRZYSZTOF MARS** and **DOROTA MARS**. Individually and as the parents and natural guardians of M.M., an infant,

*Defendants*

---

### RE-REFILED

## SECOND AMENDED VERIFIED COMPLAINT

INFANT DEFENDANTS ARE IDENTIFIED BY INITIALS ONLY

CORY H. MORRIS (CM 5225)
*Attorney for the Plaintiffs*
33 Walt Whitman Rd, suite 310
Dix Hills, New York 11749
(631) 450–2515
*Cory.H.Morris@protonmail.com*

VICTOR JOHN YANNACONE, JR.
        (VY 6405)  *of counsel*
*vyannacone@yannalaw.com*

# TABLE OF CONTENTS

Second Amended Verified Complaint ............................................. 3

Preliminary Statement of Claims ................................................. 3

Jurisdiction ...................................................................... 4

Equity Jurisdiction ............................................................. 5

    Exhibit 1, New York Daily News, Saturday, May 19, 2018 ............ 6

Venue........................................................................... 6

The Plaintiffs ................................................................... 7

The Institutional Defendants .................................................. 8

The Defendant Parents and their cyberbully children ................ 13

The cyberattack and cyberassaults ........................................... 14

    The *Discord* website........................................................ 14

    The cyberassault images ................................................... 17

       Cyberassault image Exhibit 2 ..................................... 18

       Cyberassault image Exhibit 3 ..................................... 18

       Cyberassault image Exhibit 4 ..................................... 20

       Cyberassault image Exhibit 5 ..................................... 21

       Cyberassault image Exhibit 6 ..................................... 22

       Cyberassault image Exhibit 7 ..................................... 24

       Cyberassault image Exhibit 8 ..................................... 25

       Cyberassault image Exhibit 9 ..................................... 26

Defendants' response to the cyberassaults ................................. 27

The conspiracy and cover-up ................................................. 30

The Causes of Action ......................................................... 32

The *Civil Rights Acts* ........................................................ 33

42 U.S.C. §1983 Municipal liability ................................................ 38

42 U.S.C. §1983 Denial of equal protection ................................... 39

42 U.S.C. §1983: violating bodily integrity .................................... 39

42 U.S.C. §1983: Improper supervision ......................................... 40

42 U.S.C. §1981: Contract rights .................................................. 43

42 U.S.C. §§1985, 1986: Conspiracy.............................................. 57

42 U.S.C. §2000-d: *Civil Rights Act* Title VI................................ 59

42 U.S.C. §2000a: *Civil Rights Act* Title VI................................. 61

Pendent Jurisdiction..................................................................... 62

Negligence .................................................................................... 62

Intentional infliction of emotional distress................................... 64

Negligent infliction of emotional distress ..................................... 65

Prima Facie Tort ........................................................................... 65

Breach of Contract ........................................................................ 65

Personal Injury and Damage ........................................................ 68

Damages from racial/ethnic discrimination .................................. 68

Prayer for Relief............................................................................ 68

Parents' Verifications .................................................................... 74

Parents' Verifications .................................................................... 75

NOTICE OF FILING UNDER SEAL ........................................... 76

Infant Plaintiffs' Verifications...................................................... 77

Affirmation of Electronic Filing ................................................... 78

## SECOND AMENDED VERIFIED COMPLAINT

Plaintiffs**, D.W.M.,** a minor by Willie Moore, his father, and Ursula Moore, his mother, **D.D.M.,** a minor by Willie Moore, his father, and Ursula Moore, his mother, and **WILLIE MOORE AND URSULA MOORE**, by and through their attorneys the LAW OFFICES OF CORY H. MORRIS, CORY H. MORRIS, P.C., as and for their Verified Complaint against the Defendants herein, state and alleges as follows:

## PRELIMINARY STATEMENT OF CLAIMS

1. This is a civil action wherein Plaintiffs seek equitable relief based on recognition of a child's liberty interest(s) in bodily integrity, their right to be free from fear, and the right of parents to the knowledge that their children will be protected when they delegate the liberty interest associated with the upbringing of children and educational responsibility to a private educational institution.

2. The Plaintiffs seek general, compensatory, and punitive damages, together with costs and disbursements, including reasonable attorneys' fees, in order to provide just compensation to them for the injuries and damage that resulted from the unprovoked, racially motivated threats and torment of Plaintiff D.W.M., a black African American student by means of cyberassaults over the Internet by certain white students also attending St. Mary School.

3. The cyberassaults arose out of attendance at St. Mary School, a private Roman Catholic educational institution acting under color of state law to provide the Plaintiffs with a means of complying with the New York State compulsory education requirement in a Roman Catholic elementary school providing Roman Catholic religious education and New York State secular education consistent with Roman Catholic moral values.

4. The violation of the mind and body of Plaintiff D.W.M. from those cyberattacks and cyberassaults which included racist epithets, threats, and images associated with violent death and ignored and disregarded an active threat of impending physical violence to Plaintiff D.W.M occurred because the Defendants tolerated and condoned racist attitudes among the students attending St. Mary School.

5. Defendants St. Mary School and the Diocese of Rockville Centre contracted to provide an elementary school education consistent with the Roman Catholic faith yet failed to protect the infant Plaintiff D.W.M. from death threats, disparate treatment and discrimination by reason of his race, color and/or national origin and failed to take positive action as promised in the *Parent Student Handbook* to address racial threats, bullying, overt, implicit and statements of racial bias by certain white students to Plaintiff D.W.M.

6. Defendants had the time from the school massacres at Parkland to those at Santa Fe to act responsibly to protect the rights of the infant Plaintiff D.W.M., yet they have done nothing effective to date.

7. Plaintiffs have no adequate remedy at law, having exhausted other means available. and Defendant St. Mary School, its agents and employs, refuse to even speak to Plaintiffs to remedy the ongoing threats and racial discrimination experienced by Plaintiff D.W.M.

8. The harm the racist motivated racist motivated cyberattack and cyberassaults by Defendants L.M., M.M., and M.J., to the infant Plaintiffs is ongoing and essentially irreparable.

9. Equity mandates a remedy due to the very real likelihood of harm to students by other students who threaten gun violence.

# JURISDICTION

10. The jurisdiction of this Court is invoked under 28 U.S.C. §§1331 and 1343.

11. The Civil Rights Acts—42 U.S.C. §1981, 42 U.S.C. §1981, 42 U.S.C. §1983, 42 U.S.C. §1985, and 42 U.S.C. §1986 are an integrated Legislative unit manifesting the intent of Congress to create a bundle of rights protected by the Constitution.

12. This Court is requested to exercise supplemental jurisdiction with respect to Plaintiff's State Law claims pursuant to 28 U.S.C. §1367.

13. On or about May 10, 2018, Plaintiffs submitted a Complaint setting forth the substance of this action to the Office for Civil Rights, U.S. Department of Education.

14. No other such similar relief has been requested and the Office for

Civil Rights, U.S. Department of Education has failed to further act or intervene in this litigation.

15.   This action has been commenced within the three-year statute of limitations applicable to federal civil rights actions brought pursuant to 42 U.S.C. §§1981, 1983, 1985 and 1986 as well as within the applicable statutes of limitations for the pendant state law claims.

## EQUITY JURISDICTION

16.   This Honorable Court is being asked to fashion an appropriate equitable remedy and provide equitable relief for the benefit of the Plaintiffs.

17.   The photographs posted on the Internet by Defendants L.M., M.M., and M.J. at Defendant St. Mary School which are set forth hereafter in this verified complaint designated Exhibits 2 through 9 are sufficient threat to clearly establish in the Plaintiffs reasonable fear of irreparable injury in the context of the violence in the schools during this year.

18.   This Honorable Court is asked to take judicial notice that death is the ultimate "irreparable injury" and that the front page headline of the New York Daily News which was on every newsstand within the Eastern District of New York on Saturday, May 19, 2018, establishes the gravity of the threat to the Plaintiffs supporting their claims for equitable relief.

19.   A copy of that front page designated Exhibit 1 is annexed hereto and made a part of this Complaint as if fully and at large set forth herein on the following page.



**Exhibit 1, New York Daily News, Saturday, May 19, 2018**.

## VENUE

20.  All the events involving the parties to this action occurred in Suffolk

County, New York.

21.   The Plaintiffs each reside in Suffolk County, New York.

22.   The principle place of operation of the Defendant St. Mary School is in Suffolk County, New York.

23.   The principle place of business for the Defendant Biagio M. Arpino is in Suffolk County, New York.

24.   The principle place of business for the Defendant Diocese of Rockville Centre is in Nassau County, New York.

25.   Upon information and belief, the infants L.M., M.M., and M.J. each reside with their parents in Suffolk County, New York.

26.   Upon information and belief, the parents of the infants each reside in Suffolk County, New York

27.   Venue in the Eastern District of New York is proper under 28 U.S.C. §1391.

## THE PLAINTIFFS

28.   Plaintiff D.W.M. is an African American male child who, at the time of the events giving rise to the causes of action herein was thirteen/fourteen years of age and about to graduate from Eighth Grade at St. Mary School and move on to his freshman year at Holy Trinity High School to which he had been accepted for admission for the 2018–2019 School year.

29.   That Plaintiff D.W.M. has been a student at St. Mary School since pre-Kindergarten.

30.   Plaintiff D.D.M. is an African American male child who, at the time of the events giving rise to the causes of action herein was eleven years of age and a student in the Sixth Grade at St. Mary School and planned to continue as a student in the Seventh Grade at St. Mary School for the 2018–2019 School year, but the racist motivated cyberattack and cyberassaults on his brother, Plaintiff D.W.M. will make it necessary for him to leave St. Mary School and attend another elementary school in a different area.

31.   That Plaintiff D.D.M. had been a student at St. Mary School since Pre-Kindergarten.

32.   Plaintiff URSULA MOORE is an African American woman and the

mother and natural guardian of the infant Plaintiffs D.W.M. and D.D.M.

33.  Plaintiff WILLIE MOORE is an African American man and the father and natural guardian of Plaintiffs D.W.M. and D.D.M.

34.  Plaintiff WILLIE MOORE and Plaintiff URSULA MOORE are practicing Roman Catholics and members of St. Mary Parish in East Islip.

# THE INSTITUTIONAL DEFENDANTS

35.  Upon information and belief, at all the times and at all the places stated and alleged in this complaint:

36.  According to its website, http://saintmaryschoolei.org/, "The community of St. Mary School is dedicated to nurturing students in the Catholic Faith as they pursue academic excellence. We strive to empower each student to discover their unique abilities and enhance their self-worth."

37.  According to its website, http://saintmaryschoolei.org/, "St. Mary School was founded in 1914 by the School Sisters of Notre Dame. For over one hundred years, the "charism" of that religious community, which is "unity, and educating in all we do and world vision continues to permeate who we are."

38.  Defendant ST. MARY SCHOOL applied for and did and, upon information and belief, still does apply for and receive funds in the nature of "aid" and/or "reimbursement from the federal government of the United States and from the State of New York as well as from other government sources, and not-for-profit organizations.

39.  Upon information and belief, Defendant ST. MARY SCHOOL was and is under the jurisdiction and control of the Defendant DIOCESE OF ROCKVILLE CENTRE.

40.  According to its website, http://www.drvc.org/, Defendant DIOCESE OF ROCKVILLE CENTRE makes up the Roman Catholic Church on Long Island. It claims that,

> "As a sacramental community, we are one with the Roman Catholic Church throughout the world, while here at home we are united under our Diocesan Bishop,

> Bishop John O. Barres to live the Gospel of Jesus
> Christ as one family of faith and to celebrate this life in
> our liturgy, sacraments, prayer and service."

41.     According to its website, http://www.drvc.org/, "Formed from the Diocese of Brooklyn in 1957, the Diocese of Rockville Centre (www.drvc.org) by reason of population, is the eighth largest diocese (inclusive of archdioceses) in the United States. Total Catholic population in the Diocese is 1,455,644*. Total population in the Diocese of Rockville Centre is 2,908,917."

42.     According to its website, http://www.drvc.org/, "The Roman Catholic Church on Long Island is comprised of 133 parishes (plus one campus parish) in 115 towns as well as the Diocesan corporation, housed at the Pastoral Center in Rockville Centre."

43.     According to its website, http://www.drvc.org/, "The Diocese is blessed with 351 priests in active ministry: (208 incardinated, 89 externs, 54 religious), 980 religious women, 67 brothers and 292 permanent deacons are in ministry."

44.     According to its website, http://www.drvc.org/, "The Diocese of Rockville Centre, with its parishes, schools and other Diocese-associated institutions is the second largest non-governmental employer on Long Island with approximately 19,800 lay employees."

45.     Subject only to express limitations imposed by the laws of the State of New York and the United States of America, Defendant Diocese of Rockville Centre operates under the Canon Law of the Roman Catholic Church.

46.     The canon law of the Roman Catholic Church, *jus canonicum,* is the system of laws and legal principles made and enforced by the hierarchical authorities of the Roman Catholic Church to regulate its external organization and government and to order and direct the activities of Catholics toward the mission of the Church. It was the first modern Western legal system and is the oldest continuously functioning legal system in the West.

47.     Positive ecclesiastical laws, derive formal authority from promulgation by the supreme legislator—the Supreme Pontiff— who possesses the totality of legislative, executive, and judicial power in his person, while particular laws derive formal authority

from promulgation by a legislator inferior to the supreme legislator, whether an ordinary or a delegated legislator.

48. The actual subject material of the canons is not just doctrinal or moral in nature, but all-encompassing of the human condition. It has all the ordinary elements of a mature legal system with laws, courts, lawyers, and judges, principles of legal interpretation, and coercive penalties.

49. The jurisprudence of Roman Catholic canon law is the complex of legal principles and traditions within which canon law operates.

50. Defendant Diocese of Rockville Centre is administered as part of the Roman Catholic Church by Most Reverend John Oliver Barres, S.T.D., J.C.L., D.D., the Fifth Bishop of Rockville Centre appointed to his position by Pope Francis the Supreme Pontiff and head of the Roman Catholic Church throughout the World.

51. Bishop Barres is a graduate of Princeton University holding a BA in English Literature, and the New York University Graduate School of Business Administration where he earned an MBA in Management. His theological education includes an STB and an STL in Systematic Theology from the Catholic University of America and a JCL in Canon Law and an STD in Spiritual theology from the Pontifical University of the Holy Cross in Rome.

52. Pope John Paul II named John Oliver Barres a "Chaplain to His Holiness" in July 2000 with the title of "Monsignor." Pope Benedict XVI named him a "Prelate of Honor" in November 2005.

53. Bishop Barres was ordained a Bishop and installed as the fourth Bishop of Allentown by His Eminence, Justin Cardinal Rigali, Archbishop of Philadelphia at the Cathedral of Saint Catharine of Siena in Allentown on July 30, 2009. He was the first priest ordained a bishop within the Diocese of Allentown.

54. According to its website, http://www.drvc.org/,

> "As part of the educational ministry of the Church on Long Island, we believe Catholic schools are 21st century learning communities in which the gospel of Jesus is taught, lived, and experienced on a daily basis. Quality curricula and instruction are balanced with a strong moral foundation and spiritual development in order to prepare our students for a faith-filled and

productive life, locally, nationally, and globally."

55.    According to its website, http://www.drvc.org/,

> "In the Diocese of Rockville Centre: Catholic schools are
> visible signs of God's love and the mission of the
> Church serving parish and local communities. Catholic
> schools integrate our Catholic faith and culture into all
> areas of life. Catholic schools are committed to
> academic excellence utilizing emergent technologies to
> enhance learning. Catholic schools build on the past
> and prepare for the future and educate students to be
> the leaders of tomorrow. Catholic schools involve and
> seek the support of clergy, parents, and guardians in
> the education and spiritual development of students.
> Catholic school administrators, teachers, and staff are
> competent, caring, and committed professionals who
> value and respect all in the school community."

56.    According to its website, http://www.drvc.org/,

> "The Mission of the Catholic Schools in the Diocese of
> Rockville Centre is to foster an environment of spiritual
> and intellectual growth by integrating Catholic
> tradition and faith throughout the educational process.
> This is accomplished by the promotion of Gospel values
> as proclaimed and taught by the Catholic Church,
> lifelong service, global awareness, and academic
> excellence that prepares our students to be
> compassionate, as well as critical and creative thinkers
> in an ever changing society."

> "Graduates of our Catholic elementary schools have
> been given a strong foundation in the Catholic faith
> and are academically prepared to continue their
> education. They are expected to communicate
> effectively, work both independently and
> collaboratively, make choices that lead to personal and
> professional success, and be compassionate individuals
> who will become leaders in the Church and civic
> community. Graduates of our Catholic elementary
> schools have been given a strong foundation in the
> Catholic faith and are academically prepared to

continue their education. They are expected to communicate effectively, work both independently and collaboratively, make choices that lead to personal and professional success, and be compassionate individuals who will become leaders in the Church and civic community."

57. According to its website, http://www.drvc.org/, "The Office for the Protection of Children and Young People (OFPCYP) for the Diocese of Rockville Centre was established in 2003 in response to the document published by The United States Conference of Catholic Bishops: The Charter for the Protection of Children and Young People. With the issuance of the Charter, the Bishops of the United States established standards that were to be implemented in every diocese throughout the country to insure that the most vulnerable would be safe in our Church."

58. Defendant BIAGIO M. ARPINO is the Principal of St. Mary School.

59. According to its website, http://saintmaryschoolei.org/, in a letter posted by Defendant BIAGIO M. ARPINO, as Principal,

"St. Mary School is an exciting learning community that offers our students a rewarding educational experience. We strive each day to challenge our students to discover more and more about themselves and the world in which they live. For the past forty-four years, I have been a member of the school community. For six years I taught sixth and eighth grades. I was Assistant Principal in 1979. In 1986 I became principal and remain in that position today. Over the course of my career, I taught elementary, high school and college courses. I have also been involved in the Religious Education Program of several parishes in the Diocese of Rockville Centre. I hold a B.S. degree in Elementary Education, a M.S. degree in Elementary Education and a Professional Diploma in Educational Administration. Presently, I also serve in a part-time capacity as the Assistant Superintendent for Personnel in the Department of Education in the Diocese of Rockville Centre."

60. Upon information and belief, Defendant BIAGIO M. ARPINO knew,

or should have known, that one or more of the Eighth Grade students at St Mary Elementary School manifested overt racist "Nazi" attitudes toward Plaintiff D.W.M. because he was a black African American.

61.     Upon information and belief, Defendant Diocese of Rockville Centre knew, or should have known, that one or more of the Eighth Grade students at St Mary Elementary School manifested overt racist "Nazi" attitudes toward Plaintiff D.W.M. because he was a black African American.

## THE DEFENDANT PARENTS AND THEIR CYBERBULLY CHILDREN

62.     Upon information and belief, the infant L.M. was and still is a student at St. Mary School and participated in the cyberattack and cyberassaults upon the civil rights and liberty interests of Plaintiff D.W.M.

63.     Upon information and belief, Kerri Lechtrecker is the mother of the infant L.M. and permitted her son to access the Internet and participate in the cyberattack and cyberassaults upon the civil rights and liberty interests of Plaintiff D.W.M. and, upon information and belief, E.G.M., is the father of the infant L.M. and permitted his son to access the Internet and participate in the cyberattack and cyberassaults upon the civil rights and liberty interests of Plaintiff D.W.M.

64.     Upon information and belief, the infant M.M. was and still is a student at St. Mary School and participated in the cyberattack and cyberassaults upon the civil rights and liberty interests of Plaintiff D.W.M.

65.     Upon information and belief, KRZYSZTOF MARS is the father and DOROTA MARS is the mother of the infant M.M. and as the parents of M.M. permitted their son to access the Internet and participate in the cyberattack and cyberassaults upon the civil rights and liberty interests of Plaintiff D.W.M.

66.     Upon information and belief, the infant M.J. was and still is a student at St. Mary School and participated in the cyberattack

and cyberassaults upon the civil rights and liberty interests of
Plaintiff D.W.M.

67.   Upon information and belief, "MIKE" JONES is the father and
CHRISTINE JONES is the mother of the infant M.J. and as the
parents of M.J.  permitted their son to access the Internet and
participate in the cyberattack and cyberassaults upon the civil
rights and liberty interests of Plaintiff D.W.M.

## THE CYBERATTACK AND CYBERASSAULTS

68.   At all the times relevant to this litigation, Plaintiff D.W.M. was a
duly enrolled, identifiable, and identified graduating Eighth
Grade student at St. Mary Elementary School St. Mary School.

69.   Upon information and belief, Defendants St. Mary School, Biagio
M. Arpino, and the Diocese of Rockville Centre, individually
and/or collectively, jointly and/or severally, tolerated, condoned
and effectively facilitated regular Internet access by students at
St. Mary School.

70.   Upon information and belief, Defendants St. Mary School, Biagio
M. Arpino, and the Diocese of Rockville Centre, individually
and/or collectively, jointly and/or severally, tolerated, condoned
and effectively facilitated access by students at St. Mary School to
an unmonitored and unregulated website, *Discord*,
https://discordapp.com/ and tolerated, condoned and effectively
facilitated student use of that website.

71.   Upon information and belief, Defendants St. Mary School, Biagio
M. Arpino, and the Diocese of Rockville Centre, individually
and/or collectively, jointly and/or severally, tolerated, condoned
and effectively facilitated racial animus by white students against
African American/black students at St. Mary School.

72.   Defendants, collectively, subjected Plaintiff D.W.M. to a racially
hostile environment whereby he was unable to obtain a Catholic
School education and enjoy the contractual relationship for a
Catholic School education on equal grounds as the white students
who attended St. Mary School.

## The *Discord* website

73.   According to readily available information from the internet as
early as February, 2017, it was known that over 25 million users

have flocked to *Discord*, a text and voice platform for gamers, since its launch in May of 2015. Yet, Despite the company raising at least $30 million in venture capital funding, the company has only five "customer experience" personnel and no moderators on its staff. Users who wish to engage in harassment, raid servers, or bombard chats and users with child pornography suffer no lasting repercussions or penalties from such actions.

74.    According to *Discord* CEO Jason Citron, a majority of users are on *Discord* for its intended purpose—chatting while gaming—but the number who aren't is growing, and the prospect of centralized moderation for 12,000 real-time chat rooms is beyond daunting. According to Tali Fischer, Discord's Director of PR and Events *Discord* isn't even remotely staffed to attempt such a feat. "We don't moderate each server," she admitted.

75.    Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre, individually and/or collectively, jointly and/or severally, knew or should have known that allowing unmonitored and unregulated use of *Discord* posed a threat to students, facilitated harassment and bullying, and permitted students to execute cyberassaults upon the civil rights and liberty interests of Plaintiff D.W.M.

76.    Upon information and belief, once L.M. launched his cyberattack upon the civil rights and liberty interests of Plaintiff D.W.M. by posting consecutive cyberassaults images on one or more *Discord* channels, upon information and belief, M.M. reposted images to his channel and one or more other channels, and upon information and belief, M.J. reposted images to his channel and one or more other channels,.

77.    Upon information and belief, "Jared" is the avatar used by L.M. to disguise his identity.

78.    Upon information and belief, the avatar Jared refers to Jared Scott Fogle, also known as "the Subway Guy", a former spokesperson for Subway restaurants and a convicted child molester who agreed to plead guilty in federal court to possessing child pornography and traveling to pay for sex with minors and has been sentenced to serve 15 years, 8 months in federal prison,

with a minimum of 13 years before becoming eligible for early release.

79. Upon information and belief, Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre knew and had reason to know that L.M. engaged anti-social behavior.

80. Upon information and belief, Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre knew and had reason to know that L.M. was dangerous.

81. Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre knew and had reason to know of racial animus, that being animus of white students against black students, yet were indifferent to such treatment in that Defendants, collectively, did not effectively punish, reprimand, separate, remove and/or ameliorate racially motivated harassment against black/African American students.

82. Upon information and belief, Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre knew and had reason to know that L.M. harbored racial animus toward black/African American students.

83. Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre had substantial control of the white students who harassed and threatened black students, yet were indifferent to such treatment in that Defendants, collectively, did not effectively punish, reprimand, separate, remove and/or ameliorate racially motivated harassment against black/African American students.

84. By acting and failing to act, Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre who had knowledge of the severe and discriminatory harassment against black/African American students acted with deliberate indifference in failing to ameliorate the actions of its white

students who, *inter alia*, sent racial motivated threats to black/African American students.

85. Upon information and belief, the cyberassault images designated Exhibits 2 through 8 have been posted to 11 or more *Discord* channels.

86. The WWW is a global set of documents, images and other resources, logically interrelated by hyperlinks and referenced with Uniform Resource Identifiers (URIs). URIs symbolically identify services, servers, and other databases, and the documents and resources that they can provide. Hypertext Transfer Protocol (HTTP) is the main access protocol of the World Wide Web. Web services also use HTTP to allow software systems to communicate in order to share and exchange business logic and data.

87. The World Wide Web (WWW) is the primary application program that billions of people use on the Internet.

88. The Internet is the global system of interconnected computer networks that use the Internet protocol suite (TCP/IP) to link devices worldwide. It is a network of networks that consists of private, public, academic, business, and government networks of local to global scope, linked by a broad array of electronic, wireless, and optical networking technologies. The Internet carries a vast range of information resources and services, such as the inter-linked hypertext documents and applications of the World Wide Web (WWW), electronic mail, telephony, and file sharing.

89. That as a means of racist cyberattack and cyberassaults, the Internet is a "dangerous instrumentality."

## The cyberassault images

90. The following cyberassault image designated Exhibit 2, incorporated herein and made a part of this Complaint was sent by means of the Internet and the World Wide Web on or about 7 December 2017 at approximately 1648 hours, upon information and belief, by L.M., M.M., and M.J. acting individually and/or collectively, jointly and/or severally, as a cyberassault upon the person and the civil rights and liberty interests of Plaintiff D.W.M.

**Cyberassault image Exhibit 2**



91.    The following cyberassault image designated Exhibit 3, incorporated herein and made a part of this Complaint was sent by means of the Internet and the World Wide Web on or about 17 December 2017 at approximately 1645 hours, upon information and belief, by L.M., M.M., and M.J. acting individually and/or collectively, jointly and/or severally, as a cyberassault upon the person and civil rights and liberty interests of Plaintiff D.W.M.

**Cyberassault image Exhibit 3**



92.   Upon information and belief, the cyberassault image of Exhibit 3 is generally understood among adolescent boys to be an overt demand that the recipient of the cyberassault image should commit suicide.

93.   Plaintiff D.W.M. perceived cyberassault image Exhibit 3 as a threat that if he did not commit suicide the cyberbullies L.M., M.J., and M.M., individually and/or collectively, jointly and/or severally, would kill him themselves just because he was a black African American.

**94.** That the following cyberassault image designated EXHIBIT 4, incorporated herein and made a part of this Complaint was sent by means of the Internet and the World Wide Web on or about 7 December 2017 at approximately 1649 hours, upon information and belief, by L.M., M.M., and M.J. acting individually and/or collectively, jointly and/or severally, as a cyberassault upon the person and civil rights and liberty interests of Plaintiff D.W.M.

**Cyberassault image Exhibit 4**



**95.** The cyberassault image designated Exhibit 4 caused the infant Plaintiff D.W.M. to live in fear for his life and constantly be aware of the sorry American history of lynching young black African American men just because they were black.

**96.** To Plaintiff D.W.M. a black African American adolescent boy there is no other meaning to be drawn from Exhibit 4 but an overt threat of being lynched

**97.** That the following cyberassault image designated EXHIBIT 5,

incorporated herein and made a part of this Complaint was sent by means of the Internet and the World Wide Web on or about 7 December 2017 at approximately 1646 hours, upon information and belief, by L.M., M.M., and M.J. acting individually and/or collectively, jointly and/or severally, as a cyberassault upon the person and civil rights and liberty interests of Plaintiff D.W.M.

**Cyberassault image Exhibit 5**



98.   The image of the Ku Klux Klansperson in a white sheet and hood with their arm raised in the "Seig Heil" Nazi salute signaling obedience and devotion to the party leader, Adolf Hitler, and his plans to exterminate Blacks, Jews, Gypsies and other non-Aryan people by means of violent genocide is a chilling overt threat of murder.

99.   To adolescent boys in the American culture, any symbol associated with the Ku Klux Klan (KKK) almost invariably means

lawlessness and terrorism—murder, arson, and mutilation— and instilled in its victim Plaintiff D.W.M. as well as later, his family, well-grounded fear of physical violence.

100.  To Plaintiff D.W.M. a black African American adolescent boy there is no other meaning to the cyberassault image of Exhibit 5, than an overt threat of violent death.

101.  The threat perceived by Plaintiff D.W.M. and the Moore family was only heightened by the claim associated with the cyberassault image of Exhibit 5 that hooded Klansperson was the father of "Jared," who, upon information and belief, is L.M. and whose father is known to the Moore family to have been associated with law enforcement on Long Island.

102.  Plaintiff D.W.M. did not report the cyberattack and the cyberassaults of 7 December 2017 to his parents or to St. Mary School authorities because he was afraid and intimidated by the intent of the cyberassault images.

103.  The following cyberassault image designated EXHIBIT 6, incorporated herein and made a part of this Complaint was sent by means of the Internet and the World Wide Web on or about 12 April 2018 at approximately 1843 hours, upon information and belief, by L.M., M.M., and M.J. acting individually and/or collectively, jointly and/or severally, as a cyberassault upon the person and civil rights and liberty interests of Plaintiff D.W.M.

104.  Upon information and belief, the second cyberassault image of Exhibit 6 following entitled "Devin_kill" can have only one meaning. It is a direct and overt threat of violent death directed at Plaintiff D.W.M. just because he is a black student at St. Mary School.

**Cyberassault image Exhibit 6**



105. The following cyberassault image designated Exhibit 7, incorporated herein and made a part of this Complaint was sent by means of the Internet and the World Wide Web on or about 12 April 2018 at approximately 1855 hours, upon information and

belief, by L.M., M.M., and M.J. acting individually and/or collectively, jointly and/or severally, as a cyberassault upon the person and civil rights and liberty interests of Plaintiff D.W.M.

106. Upon information and belief, the cyberassault image designated Exhibit 7 herein is generally accepted among adolescent boys to mean that the body of Plaintiff D.W.M. will be disposed of and can eventually be found in a trash can. Plaintiff D.W.M. took this as an overt threat that the cyberbullies L.M., M.J., and M.M., individually and/or collectively, jointly and/or severally, intended to kill him just because he was a black student in their class.

**Cyberassault image Exhibit 7**



107.   The following cyberassault image designated **EXHIBIT 8**, incorporated herein and made a part of this Complaint was sent by means of the Internet and the World Wide Web on or about 12 April 2018 at approximately 1916 hours, upon information and belief, by L.M., M.M., and M.J. acting individually and/or collectively, jointly and/or severally, as a cyberassault upon the person and civil rights and liberty interests of Plaintiff D.W.M.

**Cyberassault image Exhibit 8**



108.   Upon information and belief, the cyberassault image designated
Exhibit 8 was entitled "oof" by L.M. It is commonly understood
among adolescent boys that "oof" is the noise made by a dying
player of "Roadblocks," a computer game well known to adolescent
boys.

109.   The following image designated **EXHIBIT 9**, incorporated herein
and made a part of this Complaint was sent by means of the
Internet and the World Wide Web on or about 12 April 2018 at
approximately 1829 hours, upon information and belief, by L.M.,
M.M., and M.J. acting individually and/or collectively, jointly
and/or severally, as a cyberassault upon the person and liberty
interest of Plaintiff D.W.M.

**Cyberassault image Exhibit 9**



110. Upon information and belief, M.M. a student in the Eighth Grade of Defendant ST. MARY SCHOOL transmitted one or more of the cyberassault images designated Exhibits 2 through 9 through a gmail account associated with St. Mary School under the guise that it was for school project.

## DEFENDANTS' RESPONSE TO THE CYBERASSAULTS

111. When the cyberassault images appeared on 12 April 2018 his face on them Plaintiff D.W.M. believed that the cyberbullies L.M., M.J., and M.M. were at the point of wanting to kill him so he showed the cyberassault images to his mother, Plaintiff URSULA MOORE at home after school on Friday 13 April 2018.

112. Plaintiff URSULA MOORE immediately sent an email to Mrs. Gelling at Defendant ST. MARY SCHOOL.

113. On Saturday, April 14th, 2018, Plaintiff URSULA MOORE received an email from Mrs. Theresa Gelling, the 7th & 8th Grade Science Teacher, stating,

> "…I immediately sent an email to L.'s mother telling her that she must have him remove these images at once. I also requested that she go through all of L.'s previous postings as well. I have notified both Mr. Arpino and Mrs. Ceramello.
>
> I am very sorry that this has occurred. No student or family should have to see these types of defamatory images. It is absolutely unacceptable. Please know that we will do everything we can to protect Devin and all of our students from this type of cyberattack. It is unacceptable. I will let you know when I receive a response from L.'s mother.
>
> Again, I am very sorry. …"

114. Upon information and belief, L.M. admitted that he, along with M.M. and M.J. were responsible for the cyberassaults on Plaintiff D.W.M.

115. On Monday, April 16, 2018, Plaintiff Ursula Moore was told that Ms. Toni Anne Rossi needed to speak to her.

116.  On Monday, April 16, 2018, Plaintiff Ursula Moore was told about the admission from L.M. and the involvement of M.M. and M.J. in their concerted effort to conduct a  racist motivated cyberattack and cyberassaults on the Plaintiff D.W.M. because of his race.

117.  On Monday, April 16, 2018, Plaintiff Ursula Moore met with Toni Anne Rossi, Kathleen Razetti of Defendant St. Mary School and a Diocese Technology Representative in Mrs. Sloane's office, a secretary, who was witnessing/listening to this meeting.

118.  That in response to the complaint filed by Plaintiff Ursula Moore, Defendant Biagio M. Arpino responded with a letter dated 20 April 2018, wherein he stated,

"The school's administrative team, teacher and Diocesan administrators conducted an evaluation on the next school day

• · Your son provided information concerning the incident and previous unreported incidents

• Steps were immediately taken to ensure your son's sense of safety

• All students involved were questioned

• In conjunction with the building administrators and Diocesan administrators, consequences were identified for the students involved

• All students involved were given appropriate consequences. Parents are only made aware of consequences and/or supports assigned to their own student for the privacy of all

• Steps were taken to separate your son from the boy he was most concerned with for the remainder of the year

• Your son was given a plan to follow to ensure he has a means to be proactive should he feel unsafe

•All teachers and staff members working with these students have been told to oversee the students to prevent future negative interactions whenever possible

• Parents of all students were contacted with recommendations for actions at home to address

students' behavior and inform them of school consequences

• All families and students have complied with the school's recommendations and actions

119. That Plaintiff URSULA MOORE has tried numerous times to meet face to face with Defendant BIAGIO M. ARPINO only to be told he was in workshops and that he is busy going back and forth between St. John the Baptist High School and St. Mary School. To the date of filing this Complaint, said Defendant has refused to meet with the Moore family.

120. No meaningful or effective steps were immediately taken to ensure a "sense of safety" for the infant Plaintiff D.W.M.

121. Counsel for Defendant DIOCESE OF ROCKVILLE CENTRE in his "Memorandum of Law in Opposition to Plaintiffs' Order to Show Cause" dated May 29, 2018, asserts as true, the statement by Plaintiff URSULA MOORE that, "the Pastor of the Parish and [St. Mary] school, Father Don, was of the opinion that the individual who sent the images should have been expelled that the Church does not tolerate hate and that the images disgusted him."

122. Unfortunately, the determination of Father Don was overruled by Defendant DIOCESE OF ROCKVILLE CENTRE and forced the Moore family to seek equitable relief from this Honorable Court.

123. No meaningful or effective separation was ever established between the cyberbullies L.M., M.J., and M.M., and the infant Plaintiff D.W.M.

124. The only "plan" provided to Plaintiff D.W.M. was a suggestion that he "speak up when he feels he is being bullied."

125. When Plaintiff D.W.M. followed the advice he was given and "spoke up," nothing was done.

126. The claim by Defendant BIAGIO M. ARPINO that, "All teachers and staff members working with these students have been told to oversee the students to prevent future negative interactions whenever possible," is patently false.

127. According to the Plaintiff URSULA MOORE, the school and the Diocese are sending a clear message to the Moore family: A

student can do something hateful, vile, racist and hurtful and still
go to St. Mary School!

128.    Defendants St. Mary School, Biagio M. Arpino, and the Diocese of
        Rockville Centre knew and had reason to know that their
        purported actions taken in the letter of April 20, 2018 were
        insufficient to remedy the racial threats against D.W.M.

129.    Defendants St. Mary School, Biagio M. Arpino, and the Diocese of
        Rockville Centre knew and had reason to know that the white
        cyberbullies L.M., M.M., and M.J. who transmitted messages of
        hate and violence to D.W.M. would be free to harass, threaten and
        harm Plaintiff D.W.M. without consequence and thereby create
        and maintain a hostile learning and education environment for
        the infant Plaintiffs D.W.M. and D.D.M.

130.    Defendants St. Mary School, Biagio M. Arpino, and the Diocese of
        Rockville Centre had knowledge and substantial control of the
        white students who engaged in severe and discriminatory
        harassment yet were deliberately indifferent as Defendants,
        collectively, refused to listen to the complaints made by Plaintiffs
        of continued discriminatory harassment against D.W.M. by
        physical and electronic means after April 20, 2018.

131.    Accordingly, D.W.M. was excluded from participation in, denied
        the benefits of, and subjected to discrimination under the St. Mary
        School education program run by the Diocese of Rockville Centre
        on the ground of race, color, or national origin.

132.    Defendants St. Mary School, Biagio M. Arpino, and the Diocese of
        Rockville Centre failed to provide D.W.M. and other similarly
        situated black/African American males an academic environment
        free from racial hostility and animus.

## THE CONSPIRACY AND COVER-UP

133.    Upon information and belief, Plaintiff URSULA MOORE and
        Plaintiff WILLIE MOORE believe L.M. is being protected from
        disciplinary action and removal from contact with Plaintiff
        D.W.M. because of the position and status of his parents and
        family.

134.    Upon information and belief, Plaintiff URSULA MOORE and
        Plaintiff WILLIE MOORE believe that Defendant DIOCESE OF

ROCKVILLE CENTRE and Defendant ST. MARY SCHOOL are attempting to protect the image of St. Mary School and prevent damage to its "we follow Christian values" reputation by refusing to address the problem of overt racism and racial hatred among students at the school, even in the context of the most recent school shootings.

135.   Upon information and belief, Plaintiff URSULA MOORE and Plaintiff WILLIE MOORE believe that Defendant ST. MARY SCHOOL and Defendant DIOCESE OF ROCKVILLE CENTRE had actual knowledge of anti-social actions by L.M. prior to his cyberassault upon Plaintiff D.W.M.

136.   Upon information and belief, Plaintiff URSULA MOORE and Plaintiff WILLIE MOORE believe that L.M. has been protected from the consequences of his anti-social behavior in the past and is being protected now by the Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre, individually and/or collectively, jointly and/or severally.

137.   That Defendants, individually and/or collectively, jointly and/or severally, conspired and acted together to deny Plaintiff D.W.M., an African American citizen, the full and equal benefit and protection of all laws and proceedings for the security of persons and property as are enjoyed by white citizens.

138.   Defendants, individually and/or collectively, jointly and/or severally, have placed Plaintiffs D.W.M. and D.D.M. in a dangerous, life threatening, and wholly inappropriate position in order to conceal and cover up the racist acts of certain students in the Eighth Grade at St. Mary School.

139.   Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre, individually and/or collectively, jointly and/or severally, have conspired to conceal and cover up the unprovoked and unjustified racist motivated cyberattack and cyberassaults on Plaintiff D.W.M. because they knew, or should have known, that the Defendant St. Mary School and Defendant Diocese of Rockville Centre could lose federal funding and reimbursement should they disclose the nature of the racially discriminatory conduct toward and disparate treatment of Plaintiff D.W.M.

# The Causes of Action

140.   Defendants St. Mary School, Biagio M. Arpino, and the Diocese of
       Rockville Centre, individually and/or collectively, jointly and/or
       severally, have failed to maintain St. Mary School as a "21st
       century learning communities in which the gospel of Jesus is
       taught, lived, and experienced on a daily basis;" where "Quality
       curricula and instruction are balanced with a strong moral
       foundation and spiritual development in order to prepare …
       students for a faith-filled and productive life, locally, nationally,
       and globally."

141.   Defendants St. Mary School, Biagio M. Arpino, and the Diocese of
       Rockville Centre, individually and/or collectively, jointly and/or
       severally, have failed to maintain St. Mary School as a "visible
       sign of God's love and the mission of the Church serving parish
       and local communities."

142.   Defendants St. Mary School, Biagio M. Arpino, and the Diocese of
       Rockville Centre, individually and/or collectively, jointly and/or
       severally, have failed to integrate the Catholic faith and culture
       into all areas of life at St. Mary School.

143.   Defendants St. Mary School, Biagio M. Arpino, and the Diocese of
       Rockville Centre, individually and/or collectively, jointly and/or
       severally, have failed to foster an environment of spiritual and
       intellectual growth by integrating Catholic tradition and faith
       throughout the educational process.

144.   Defendants St. Mary School, Biagio M. Arpino, and the Diocese of
       Rockville Centre, individually and/or collectively, jointly and/or
       severally, have failed to promote Gospel values as proclaimed and
       taught by the Catholic Church, lifelong service, global awareness,
       and academic excellence which would prepare students to be
       compassionate, as well as critical and creative thinkers in an ever
       changing society.

145.   Defendants St. Mary School, Biagio M. Arpino, and the Diocese of
       Rockville Centre, individually and/or collectively, jointly and/or
       severally, have failed to provide the infants L.M., M.M., and M.J.
       a strong foundation in the Catholic faith and be compassionate
       individuals who have been given a strong foundation in the
       Catholic faith and be compassionate individuals.

146.   Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre, individually and/or collectively, jointly and/or severally, have failed to comply with the spirit and intent of *The Charter for the Protection of Children and Young People* published by The United States Conference of Catholic Bishops which would insure that the most vulnerable would be safe in our Church."

147.   After the unprovoked and unjustified racist motivated cyberattack and cyberassaults on Plaintiff D.W.M. Defendants, individually and/or collectively, jointly and/or severally, have refused to provide Plaintiff D.W.M. and the entire Moore family with necessary medical care and treatment.

148.   In operating St. Mary School as an educational institution offering parents a way of satisfying the New York State mandate for compulsory education of minors while within the Roman Catholic elementary school system, Defendant St. Mary School and Defendant Diocese of Rockville Centre are performing functions traditionally exclusively reserved to the State and effectively exercising the *parens patriae* authority of the State.

149.   Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre, individually and/or collectively, jointly and/or severally, effectuating the compulsory education mandate of the State of New York acting under the custom and color of New York State in providing compulsory education,, exercised the coercive power of the State over the infant Plaintiffs and their parents with respect to certain key decisions regarding the education of Plaintiffs D.W.M. and D.D.M.

## THE *CIVIL RIGHTS ACTS*

150.   One hundred and eleven years ago, in the infamous *Dred Scott* case, the Supreme Court of the United States stated that,

> "[i]n the opinion of the court, the legislation and histories of the times, and the language used in the Declaration of Independence, show, that neither the class of persons who had been imported as slaves, nor their descendants, whether they had become free or not, were then acknowledged as a part of the people, nor intended to be included in the general words used in that memorable instrument."

> [black/African Americans are] "beings of an inferior order, and altogether unfit to associate with the white race, either in social or political relations; and so far inferior, that they had no rights which the white man was bound to respect; and that the negro might justly and lawfully be reduced to slavery for his benefit." *Id.* at 407.

151. After a bloody civil war that took the lives of nearly three quarters of a million people, in 1872, a later Supreme Court of the United States found that

> "The institution of African slavery, as it existed in about half the States of the Union, and the contests pervading the public mind for many years, between those who desired its curtailment and ultimate extinction and those who desired additional safeguards for its security and perpetuation, culminated in the effort, on the part of most of the States in which slavery existed, to separate from the Federal government, and to resist its authority. This constituted the war of the rebellion, and whatever auxiliary causes may have contributed to bring about this war, undoubtedly the overshadowing and efficient cause was African slavery."

152. In the bloodshed of Civil War, this United States created "a declaration designed to establish the freedom of four millions of slaves." However, The transition was not a seamless one. Black African Americans would soon be the target of the largest domestic terrorist organization to exist among the United States, the Ku Klux Klan.

153. Recognizing that "[t]he process of restoring to their proper relations with the Federal government and with the other States those which had sided with the rebellion, undertaken under the proclamation of President Johnson in 1865, and before the assembling of Congress, developed the fact that, notwithstanding the formal recognition by those States of the abolition of slavery,

the condition of the slave race would, without further protection of the Federal government, be almost as bad as it was before."

154. Indeed, "[a]mong the first acts of legislation adopted by several of the States in the legislative bodies which claimed to be in their normal relations with the Federal government, were laws which imposed upon the colored race onerous disabilities and burdens, and curtailed their rights in the pursuit of life, liberty, and property to such an extent that their freedom was of little value, while they had lost the protection which they had received from their former owners from motives both of interest and humanity."

155. In 1872, the Supreme Court of the United States acknowledged the horrible truth of our United States under "Jim Crow," racism *de jure*,

> "They [black/AfricanAmericans] were in some States forbidden to appear in the towns in any other character than menial servants. They were required to reside on and cultivate the soil without the right to purchase or own it. They were excluded from many occupations of gain, and were not permitted to give testimony in the courts in any case where a white man was a party. It was said that their lives were at the mercy of bad men, either because the laws for their protection were insufficient or were not enforced."

156. While the Thirteenth Amendment to the United States Constitution arguably freed black/African American persons from physical bondage, "the conviction [remained] that something more was necessary in the way of constitutional protection to the unfortunate race who had suffered so much." and the Supreme Court of the United States referring to the Thirteenth, Fourteenth, and Fifteenth Amendments to the Constitution stated that "[t]he most cursory glance at these articles discloses a unity of purpose, when taken in connection with the history of the times, which cannot fail to have an important bearing on any question of doubt concerning their true meaning. Nor can such doubts, when any reasonably exist, be safely and rationally solved without a reference to that history; for in it is found the occasion and the necessity for recurring again to the great source of power in this country, the people of the States, for additional guarantees

of human rights; additional powers to the Federal government; additional restraints upon those of the States."

157.   Born of the three constitutional amendments of Reconstruction, Thirteenth, Fourteenth, and Fifteenth Amendments and within their bundle of rights, 42 U.S.C. §1981 was originally enacted by Congress as the *Civil Rights Act of 1866* to address the racial animus and discrimination historically visited upon black/African Americans and confer the same rights upon black/African American persons "as is enjoyed by white citizens,"  and overcome the now legally codified inequities visited upon black/ African Americans by the readmitted slave States.

158.   The *Civil Rights Act of 1866* was soon amended by the *Enforcement Act of 1870* to extend "the operation of the civil rights bill ... to all persons within the jurisdiction of the United States," and has now evolved to address inequities and injustice based on race/national origin discrimination inflicted upon any citizen, even white men and women.

159.   In 1872, the Supreme Court of the United States stated

> "We repeat, then, in the light of this recapitulation of events, almost too recent to be called history, but which are familiar to us all; and on the most casual examination of the language of these amendments, no one can fail to be impressed with the one pervading purpose found in them all, lying at the foundation of each, and without which none of them would have been even suggested: we mean the freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly-made freeman and citizen from the oppressions of those who had formerly exercised unlimited dominion over him. It is true that only the fifteenth amendment, in terms, mentions the negro by speaking of his color and his slavery. But it is just as true that each of the other articles was addressed to the grievances of that race, and designed to remedy them as the fifteenth."

160.   In that struggle, the Supreme Court voiced questions,

> "Was it the purpose of the fourteenth amendment, by the simple declaration that no State should make or enforce any law which

shall abridge the privileges and immunities of citizens of the United States, to transfer the security and protection of all the civil rights which we have mentioned, from the States to the Federal government? And where it is declared that Congress shall have the power to enforce that article, was it intended to bring within the power of Congress the entire domain of civil rights heretofore belonging exclusively to the States?" *Id.* at 77.

161. In struggling with the amalgamation of new rights created by these constitutional amendments, the Supreme Court stated unequivocally , "But what we do say, and what we wish to be understood is, that in any fair and just construction of any section or phrase of these amendments, it is necessary to look to the purpose which we have said was the pervading spirit of them all, the evil which they were designed to remedy, and the process of continued addition to the Constitution, until that purpose was supposed to be accomplished, as far as constitutional law can accomplish it."

162. That the Fourteenth Amendment to the Constitution of the United States was the basis for §1 of the Ku Klux Act of April 20, 1871 which grew out of a message sent to Congress by President Grant on March 23, 1871, "urgently recommend[ing] such legislation as in the judgment of Congress shall effectually secure life, liberty, and property, and the enforcement of law in all parts of the United States…"

163. There was, during this time in our Country, "a report, nearly 600 pages in length, dealing with the activities of the [Ku Klux] Klan and the inability of the state governments to cope with it." *Id.* (citing S. Rep. No. 1, 42d Cong., 1st Sess.).

164. The reasons that the law was enacted over a century ago remains true today: "[i]t was not the unavailability of state remedies but the failure of certain States to enforce the laws with an equal hand."

165. As state actors, Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre, individually and/or collectively, jointly and/or severally, have failed to enforce the laws with an equal hand.

166. The individual elements of the *Civil Rights Acts*—42 U.S.C. §1981, 42 U.S.C. §1981, 42 U.S.C. §1983, 42 U.S.C. §1985, and 42 U.S.C.

§1986— are an integrated Legislative unit manifesting the intent of Congress to create a bundle of rights and provide the tools to address racist animus and racial discrimination in any form, "this evil by which men and women were in the wrath of physical, mental and spiritual bondage, and finally liberate black/African American persons.

167. Although identified in this Complaint as individual causes of action, the Plaintiffs plead the individual elements of the *Civil Rights Acts*—42 U.S.C. §1981, 42 U.S.C. §1981, 42 U.S.C. §1983, 42 U.S.C. §1985, and 42 U.S.C. §1986— as an integrated Legislative unit manifesting the intent of Congress to create a bundle of rights.

## 42 U.S.C. §1983 MUNICIPAL LIABILITY

168. That Diocese of Rockville Center is organized and exists under the laws of the State of New York and in exercising its *Magisterium* or teaching mandate, it is subject to the supervision and control of the New York State Department of Education, and by exercising the power and authority of the State of New York it is a state actor acting under color of state law.

169. Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre, individually and/or collectively, jointly and/or severally, failed to protect the Plaintiff D.W.M. from racist motivated cyberattack and cyberassaults upon his civil rights and liberty interests and failed to provide the environment promised in the contract established by the *Parent-Student Handbook*.

170. Plaintiff D.W.M. is entitled under the Constitution to obtain a Roman Catholic elementary school education and under the Constitution his parents are entitled to freely enter into a contract with Defendant ST. MARY SCHOOL to provide that Roman Catholic elementary school education to their children Plaintiffs D.W.M. and D.D.M.

171. Defendants, individually and/or collectively, jointly and/or severally, failed to honor their contract with the Plaintiffs and provide an appropriate Roman Catholic elementary school education for the infant Plaintiffs D.W.M. and D.D.M. because the Moore family are black African American citizens.

## 42 U.S.C. §1983 DENIAL OF EQUAL PROTECTION

172.   Plaintiffs D.W.M. and D.D.M. are members of a Constitutionally protected class by virtue of the fact that each of them is a black African American citizen and may not be subjected to purposeful discriminatory treatment directed against that identifiable class of which said Plaintiff is a member.

173.   Plaintiff Willie Moore and Plaintiff Ursula Moore, the parents of Plaintiffs D.W.M. and D.D.M. are also members of a Constitutionally protected class by virtue of the fact that they are each black African American citizens and may not be subjected to purposeful discriminatory treatment directed against that identifiable class of which said Plaintiffs are members.

174.   Plaintiff D.W.M. as a black African-American man is the victim of purposeful discrimination directed at an identifiable class.

## 42 U.S.C. §1983: VIOLATING BODILY INTEGRITY

175.   By permitting the unprovoked and unjustified racist motivated cyberattack and cyberassaults upon the civil rights and liberty interests of Plaintiff D.W.M., tolerated, condoned and effectively facilitated an act so egregious and so outrageous as to shock the contemporary conscience of the community.

176.   That Plaintiff D.W.M. who has a fundamental liberty interest to be free from physical and mental intrusion and harm was subjected to continued harassment and racial discrimination that was tolerated, condoned, and effectively facilitated by Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre, individually and/or collectively, jointly and/or severally.

177.   Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre, individually and/or collectively, jointly and/or severally, acted in the place and stead of the State of New York as *parens patriae in loco parentis* and exercised custody, dominion, and control of all students at St. Mary School.

178.   Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre, individually and/or collectively, jointly and/or severally, knew Plaintiff had a liberty interest to be free from insidious discrimination, racially motivated threats and images associated with impending physical violence against African

Americans yet was subject to continued harassment and racial discrimination that was tolerated, condoned, and effectively facilitated by Defendants, collectively.

179. Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre, individually and/or collectively, jointly and/or severally, acting under the custom and color of New York State in providing compulsory education, acted and/or failed to act with callous indifference to the outcome of their actions and/or lack of action with neglect so egregious as amounting to malice, all in violation of Plaintiffs' Constitutional rights.

## 42 U.S.C. §1983: IMPROPER SUPERVISION

180. Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre, individually and/or collectively, jointly and/or severally, as state actors under the compulsory education laws of the State of New York, acting under the custom and color of New York State in providing compulsory education, maintaining an educational institution acting *parens patriae in loco parentis* with regard to Plaintiff D.W.M. had a duty to protect the health and safety of Plaintiff and provide a safe and secure environment for the Plaintiff and all of the students at St. Mary School without regard to race and/or national origin and assure that the Plaintiff D.W.M. could attend school, study, and learn without threat of racist motivated cyberattack and cyberassaults upon his civil rights and liberty interests.

181. Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre, individually and/or collectively, jointly and/or severally, knew, or should have known, of the propensity of the infants L.M., M.M., and M.J. for conduct such as the unprovoked and unjustified racist motivated cyberattack and cyberassaults upon the civil rights and liberty interests of Plaintiff D.W.M. which caused him serious and permanent injury and damage on the premises of St. Mary School.

182. Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre, individually and/or collectively, jointly and/or severally, under the compulsory education laws of the State of New York, acting under the custom and color of New York State in providing compulsory education, exercised custodial supervision

and control over Plaintiffs D.W.M. and D.D.M. and the infants
L.M., M.M., and M.J.

183.  Defendants St. Mary School, Biagio M. Arpino, and the Diocese of
Rockville Centre, individually and/or collectively, jointly and/or
severally, did breach both contract and duty to the Plaintiff Moore
family by allowing the infants L.M., M.M., and M.J. to continue
their cyberattack and cyberassaults to the point of physical
battery after April 20, 2018.

184.  Defendants St. Mary School, Biagio M. Arpino, and the Diocese of
Rockville Centre, individually and/or collectively, jointly and/or
severally, ignored the complaints by the Moore family about the
cyberattack and cyberassaults upon the civil rights and liberty
interests of Plaintiff D.W.M.

185.  Defendants St. Mary School, Biagio M. Arpino, and the Diocese of
Rockville Centre, individually and/or collectively, jointly and/or
severally, have refused to speak with members of the Plaintiff
Moore family with regard to the cyberattack and cyberassaults
upon the civil rights and liberty interests of Plaintiff D.W.M.

186.  Defendants St. Mary School, Biagio M. Arpino, and the Diocese of
Rockville Centre, individually and/or collectively, jointly and/or
severally, by and through counsel, instructed Plaintiff Ursula
Moore not to contact or speak with any of D.W.M.'s teachers.

187.  Defendants St. Mary School, Biagio M. Arpino, and the Diocese of
Rockville Centre, individually and/or collectively, jointly and/or
severally, by and through counsel, instructed Plaintiff Ursula
Moore not to contact or speak with any of the staff or faculty at St.
Mary School.

188.  Defendants St. Mary School, Biagio M. Arpino, and the Diocese of
Rockville Centre, individually and/or collectively, jointly and/or
severally, seek to collect monies from the Plaintiff Moore family,
yet refuse to communicate with Plaintiffs.

189.  Defendants St. Mary School, Biagio M. Arpino, and the Diocese of
Rockville Centre, individually and/or collectively, jointly and/or
severally, know or knew or should have known of the racial
animus, discrimination, and threats by the the infants L.M.,
M.M., and M.J. yet they still refuse to take action to insulate and

protect black/African Americans from ongoing harm and threats of harm.

190. Defendants, collectively, endeavor to perform compulsory education yet refuse to act in *loco parentis* in resolving an ongoing threat based on the race of D.W.M.

191. Defendant St. Mary School and Defendant BIAGIO M. ARPINO knew or should have known that racial tensions existed within the Eighth Grade regarding the presence of Plaintiff D.W.M., a black African American boy, and that the failure to establish appropriate policies, practices and procedures for dealing with such racial tensions and then to properly implement such policies, practices and procedures through the considered actions of properly trained, supervised and managed employees would certainly result in depriving Plaintiff D.W.M. of his civil, human, and constitutional rights.

192. That Defendant St. Mary School had a non-delegable duty to establish appropriate policies and Defendant BIAGIO M. ARPINO as Principal of St. Mary School had a non-delegable duty to provide a safe and secure school environment which would minimize the risk of racist motivated cyberattack and cyberassaults upon the civil rights and liberty interests of Plaintiff D.W.M.

193. Defendants, jointly and severally, individually and collectively, by virtue of their standing *in loco parentis* with respect to students in their care, custody and control, were required to protect the rights of all students at St. Mary School to personal security, bodily integrity and the right to be free from fear of the threat of violence and racist motivated cyberattack and cyberassaults upon the civil rights and liberty interests by reason of their race and/or national origin.

194. Defendants, jointly and severally, individually and collectively, were negligent and/or grossly negligent, careless and/or reckless, in failing to properly investigate the complaint of the Plaintiffs and thereby violated the rights of Plaintiff D.W.M. secured under the Constitution of the United States and the New York State Constitution

.

# 42 U.S.C. §1981: CONTRACT RIGHTS

195.  According to its website, http://saintmaryschoolei.org/parents/school_policies___forms/parent-_student_handbook, Defendant St. Mary School has promulgated and maintains a detailed "Parent-Student Handbook" which, upon information and belief, has been approved by and is sanctioned by Defendant Diocese of Rockville Centre and represents established policy of the Roman Catholic Church.

196.  The Plaintiffs, by signing for and acknowledging receipt and understanding of the substance of that Parent-Student Handbook, entered into and established a contractual relationship with Defendant St. Mary School and by virtue of its hierarchal canonical relationship with Defendant Diocese of Rockville Centre, with the Diocese and the universal Roman Catholic Church.

197.  Plaintiffs, black/African Americans, were not treated the same as white parents who executed the same contract.

198.  Plaintiffs, black/African Americans have been deprived of equal opportunity to enjoy the benefits of a Roman Catholic Elementary School education at St. Mary School.

199.  Plaintiffs, black/African Americans, who complained of discrimination are no longer allowed to communicate with Defendants, including but not limited to St. Mary School agents, employees and staff.

200.  Upon demanding that an ongoing racial threat, an ongoing threat of harm be addressed, Plaintiffs, black/African Americans did not receive equal benefit of the school contract, resources and compulsory education that whites did receive.

201.  Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre, individually and/or collectively, jointly and/or severally allowed the continued enrollment of white students who provided pictures of a gun to D.W.M.'s head, a noose, Ku Klux Klan members, Hitler, and other messages made by white students toward D.W.M. in violation of the terms of the *Parent Student Handbook*

202.  The Plaintiffs have chosen to act  by bringing this action seeking

equitable relief before a foreseeable act of violence toward black/African Americans can harm their children.

203. The history of the Ku Klux Klan and the images sent by the infants L.M., M.M. and/or M.J. send a singular, unequivocal, unambiguous and clear message of hate and imminent lawless violence when sent by white students to a black/African American student.

204. Over 150 years of domestic violence by the Ku Klux Klan is reason enough for Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre, individually and/or collectively, jointly and/or severally, acting under the custom and color of New York State in providing compulsory education,  to remove the threat of harm to D.W.M. yet said Defendants still fail to do so.

205. Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre, individually and/or collectively, jointly and/or severally, acting under the custom and color of New York State in providing compulsory education, know or should know that sending an image of a Ku Klux Klan member raising a Nazi salute image to Plaintiff D.W.M. would cause him to fear the threat of imminent violent physical harm, perhaps even death.

206. Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre, individually and/or collectively, jointly and/or severally, acting under the custom and color of New York State in providing compulsory education, know or should know that sending an image of a noose to Plaintiff D.W.M. would cause him to fear the threat of imminent violent physical harm—death by lynching.

207. Defendants know that sending a noose image to Plaintiff D.W.M. caused a fear of impending physical harm to Plaintiffs.

208. Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre, individually and/or collectively, jointly and/or severally, acting under the custom and color of New York State in providing compulsory education, denied full and equal benefit of law to Plaintiffs, black/African American persons, in their attendance at St. Mary School.

209. According to that portion of the *Parent-Student Handbook* entitled, "School Mission Statement,

"The community of St. Mary School is dedicated to nurturing students in the Catholic Faith as they pursue academic excellence. We strive to empower each student to discover their unique abilities and enhance their self-worth."

210. According to that portion of the Parent-Student Handbook entitled, "St. Mary School Beliefs,"

"In light of our mission, our Beliefs are that St. Mary School will: Help students build a personal relationship with God. Enable students to experience the Gospel-centered message through service and prayer. Create a Catholic climate that contributes to the formation of students as active participants in the parish and school communities. Engage students to pursue their own intellectual development through critical thinking, innovation, and rigorous curricular standards in order to become problem solvers. Create learning experiences with the uniqueness of each student in mind. Partner with parents to support students in their learning, as they search for knowledge, meaning, and truth. Develop mutually respectful relationships by providing opportunities for ethical, intellectual, and social growth within the curricular areas as well as extracurricular activities. Provide a wide range of activities that support social interaction, physical interaction, physical development, and creative expression."

211. According to that portion of the Parent-Student Handbook entitled, "Technology,"

The goal of the technology program is to master the use of various programs, integrate these programs in all areas of the classroom curriculum, and prepare students to be vital contributors in their communities. Students will develop basic and advanced computer skills and competencies by engaging in a variety of developmentally appropriate computer projects including composition, computer animation, and other technology topics. Students will learn to use the Internet as a tool for research. Students will also learn safe Internet practices, including respecting the privacy of others.

212. According to that portion of the Parent-Student Handbook entitled, "Internet Policy,"

Computers/electronic devices with Internet access are

found in classrooms and may be used by students at
different times of the school day. In order to ensure that
technology is used safely and properly to produce the
maximum educational benefit for its use by all students,
St. Mary School has adopted the following policies:
Acceptable Use: The purpose of technology is to support
research and education. Its use must be consistent with
our educational objectives. Any use of technology that
may be found by St. Mary School faculty to be offensive,
harmful, destructive, or inappropriate is forbidden.
Privilege: The use of technology is a privilege, not a right,
and improper use will result in immediate cancellation of
that privilege. Each student is responsible for his/her own
behavior while using technology. St. Mary School retains
sole and unreviewable discretion to determine proper use.
Decisions made will be final."

213.   According to that portion of the *Parent-Student Handbook*
       entitled, "Dignity for All Students Act,"

"All children have the right to attend school in a safe,
welcoming, and caring environment free from harassment
and discrimination. The Dignity Act ensures this for all
New York State public school students. Although
religious and private schools are exempt from the Dignity
Law, much of what has been signed into the Dignity Act
has been and continues to be practiced in our Diocesan
schools. Codes of conduct exist for students, staff and
volunteers and policies are in place to create a safe
environment in our schools free from harassment,
discrimination or any form of abuse. Awareness and
prevention training is mandatory for all staff and
volunteers in our schools, and all students are provided
with age appropriate instruction that 1) defines abuse, 2)
makes clear how to report abuse, and 3) provides training
on personal safety skills. The school curriculum and
programs are built on strong instruction in civility,
citizenship and character education is standard
curriculum in our schools, with a strong emphasis on
principles of honesty, tolerance, personal responsibility,
respect for others, observance of the laws and rules,

courtesy, and dignity and respect for all. Faculty, staff, and student behavior is expected to conform to values consistent with the Catholic faith. Catholic principles that underscore the goal for our students to be more like Christ in their thoughts, words and deeds."

214. According to that portion of the Parent-Student Handbook entitled, "Harassment and Bullying Policy,"

"Harassment or bullying is defined as acts or behaviors repeated over time that involve a real or perceived imbalance of power. Any gesture whether written, verbal, graphic or a physical act (including electronically transmitted acts: i.e. internet, cell phone, wireless hand held device, website or social networking site) will be considered a violation of this policy. Harassment and bullying behavior is illegal and violates New York State laws. Types of harassing or bullying behaviors include: Behaviors that are intended to harm someone by damaging or manipulating his/her relationships with others. Indirect, hidden acts of aggression, social isolation, and/or excluding. Direct, blatant acts of aggression, can be physical or verbal. Harm through damage or threat of damage to another's physical well-being. Obvious and hidden acts of aggression towards another student such as threats, putdowns, and name calling. St. Mary School will not tolerate the use of ethnic or racial remarks directed towards anyone."

215. The racist motivated cyberattack and cyberassaults upon the civil rights and liberty interests of Plaintiff D.W.M. were explicit violations of the contract between the Moore family and Defendant St. Mary School evidenced by the unilateral agreement characterized as the Parent-Student Handbook which the Moore family were required to acknowledge and accept as a condition precedent to attending St. Mary School.

216. Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre, individually and/or collectively, jointly and/or severally, acting under the custom and color of New York State in providing compulsory education, acting under color of state law, have failed to prevent or even punish the racist motivated cyberattack and cyberassaults upon the civil rights and liberty interests by fellow students and have deprived Plaintiff D.W.M.,

an African American citizen, and his parents, of rights, privileges and immunities secured by the United States Constitution, including, but not limited to, those rights secured by the Constitution of the United States.

217. Defendant BIAGIO M. ARPINO who knew or should have known of the racist motivated cyberattack and cyberassaults upon the civil rights and liberty interests of Plaintiff D.W.M. failed to take appropriate action as stated in the *Parent Student Handbook* for the outrageous violations of school policy.

218. Defendants, individually and/or collectively, jointly and/or severally, have acted together to conceal and cover up the unprovoked and unjustified racist motivated cyberattack and cyberassaults upon the civil rights and liberty interests of Plaintiff D.W.M. at the St. Mary School.

219. Defendants, individually and/or collectively, jointly and/or severally, tolerated, condoned and effectively facilitated and permitted to continue the racially discriminatory targeting of Plaintiff D.W.M. and the racist motivated cyberattack and cyberassaults upon his civil rights and liberty interests by certain other students effectively denying Plaintiff D.W.M., an African American citizen, of all the benefits of a Roman Catholic Elementary School education, one of the rights, privileges, and immunities subject to equal protection of the laws.

220. Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre, individually and/or collectively, jointly and/or severally, acting under the custom and color of New York State in providing compulsory education,, having the duty and the authority and power to do so, failed to properly and fairly investigate and review the unprovoked and unjustified racist motivated cyberattack and cyberassaults upon the civil rights and liberty interests of Plaintiff D.W.M.

221. Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre, individually and/or collectively, jointly and/or severally, acting under the custom and color of New York State in providing compulsory education,, by their actions and inappropriate lack of action denied and deprived the Plaintiffs of their Constitutional rights, and in their actions and inaction said Defendants appear to have been motivated by illegal

considerations of race, national origin and color.

222. The protection from racist motivated cyberattack and cyberassaults upon the civil rights and liberty interests of Plaintiff D.W.M. is conduct explicitly prohibited by the contract created by the *Parent Student Handbook.*

223. Upon information and belief, Defendant St. Mary School and Defendant Diocese of Rockville Centre are beneficiaries of funds provided by the taxpayers of the United States and the State of New York and regardless of their status as a non-public school they must comply with federal and state laws because they provide an alternative means of complying with the compulsory education laws of the State of New York.

224. Upon information and belief, Defendants, individually and/or collectively, jointly and/or severally, have made application directly or indirectly to United States government agencies for the grant or other extension of federal funds.

225. By utilizing federal funds disbursed by authority of the United States Congress under the "Spending Clause" Defendants St. Mary School, and the Diocese of Rockville Centre, individually and/or collectively, jointly and/or severally enter into a contract under which in return for federal funds, they agree to comply with federally imposed conditions including, but not limited to, compliance with federal law prohibiting discrimination.

226. Upon information and belief, Defendants St. Mary School, and the Diocese of Rockville Centre, individually and/or collectively, jointly and/or severally, obtain state and/or federal aid, reimbursement or other funding for special needs students.

227. That according to the website maintained by Defendant ST. MARY SCHOOL, http://saintmaryschoolei.org/parents/school_programs/milk_program the school distributes milk the cost of which is subsidized by the United States Department of Agriculture (USDA), an "old line" cabinet level agency of the federal government of the United States.

St. Mary School / Parents / School Programs / Milk Program

**Milk Program**



Dear Parents or Guardians:

Milk will be available beginning Monday, September 11, 2017.  The cost for the school year will be **$65.00 per child**.  Milk for a family may be paid with one check payable to St. Mary School.  On the check, please indicate **each** child's name and homeroom grade.

The school receives reimbursement for milk served.  In the operation of the Special Milk Program, as in all Child Nutrition Programs, no child shall be discriminated against because of race, sex, color or national origin, age or handicap.  If you believe you have been discriminated against, write immediately to the Secretary of Agriculture, Washington, D.C.  20250.

If you wish to order milk for your child, please complete the **form** below and **return with your payment to school no later than Friday, September 8, 2017**.

228. That the state of New York through the new York state education department (NYSED) provides a number of funding opportunities for the Nonpublic schools of New York State and also administration distributes funds from the federal government as well. These opportunities are listed on the NYSED website at http://www.p12.nysed.gov/nonpub/fundingopportunities/#mst and

include

229. The federally-funded program, 21st Century Community Learning
Centers, supports the creation of community learning centers that
operate programs during non-school hours for students,
particularly for students who attend high-poverty and low-
performing schools, and their families. By providing tutoring and
other academic enrichment activities along with a broad array of
youth development opportunities that complement their regular
academic programs, these centers help students meet state and
local student standards in core academic subjects, such as English
language arts and math. In addition, literacy and other
educational services are offered to families of students
participating in the program.

230. Academic Intervention for Nonpublic Schools (AIS) is a one
hundred percent state funded grant, based upon Commissioner's
Regulations 100.2.  Originally created in 2003-2004, this fund was
created to assist the teachers and administrators of those
nonpublic schools which administer the state English Language
Arts and Math exams, and have students scoring at levels one and
two.  The grant provides professional development for those
educational personnel with these lower scoring students, in the
hopes of raising the bar of student performance on the State
assessment

231. Comprehensive Attendance Program (CAP) promulgated by the
Board of Regents for all schools in June, 2002.  The attendance
policy must encompass the nine points outlined in Commissioner's
Regulations 104.(i), within the State Education Department's
website.  All nonpublic schools must have such a policy on file and
may be asked to produce the policy during a site visit, or claim
review. CAP claims always occur after the MSA claim for a
specific year; in fact, a school is not eligible for CAP in a particular
school year if it has not filed the MSA claim for that year.

232. Learning Technology Grant Program (LTG) run by the Office of
Educational Design & Technology is a competitive, three-year
New York State grant program, based upon Commissioner's
Regulations 144.8. The purpose of this grant is to develop,
implement, and share innovative programs that utilize learning
technologies to personalize learning and/or increase access to

high-quality, rigorous learning experiences (such as through online, distance, or blended learning), as well as professional development programs to assist teachers and educational leaders in effectively utilizing learning technology to enhance teaching and learning. These programs (and component activities, materials, courses, etc.) will focus on improving culturally- and linguistically-responsive learning environments, and will support the mission of the NYS Board of Regents, which is to ensure that every child has equitable access to the highest quality educational opportunities, services and supports in schools that provide effective instruction aligned to the state's standards, as well as positive learning environments so that each child is prepared for success in college, career, and citizenship.

233.   Eligible applicants include public school districts, BOCES and consortiums thereof. All public school district applicants, either independent or as part of a consortium, must give religious and independent schools within their boundaries the opportunity to participate. Religious and independent schools choosing to participate must be given the opportunity for meaningful and substantial involvement in the development of the proposal. The current grant period is from September 1, 2018 to June 30, 2021.

234.   Mandated Services Aid (MSA), a state reimbursement program which began in 1974 for nonpublic schools that participate in certain mandates of the Commissioner regarding data reporting, pupil testing and pupil evaluation. In order to be eligible for reimbursement, a nonpublic school must provide instruction in accordance with section 3204 of the Education Law; require students to attend full time instruction according to section 3205 of the Education Law; not be the recipients of other State or local aid, directly or indirectly, (e.g. tuition payments); and be a not-for-profit corporation. The nonpublic must be recognized as a school by the filing of a BEDS report, and have met the all other requirements of the mandate(s) in a timely fashion; and be able to produce documentation (if necessary) to satisfy the requirements of the mandate. Currently, there are a total of 17 mandates for which schools may be eligible for reimbursement.

235.   Mathematics, Science, & Technology Teachers in Religious & Independent Schools (MST) Funds to reimburse religious and independent schools for Mathematics, Science, and Technology

teachers were appropriated in the 2017-18 enacted State budget. The program is governed by Section 3037 of Education Law https://www.nysenate.gov/legislation/laws/EDN/3037 added by Chapter 59 of 2017. Religious and independent schools that employ eligible teachers of Mathematics, Science, or Technology may seek reimbursement.

236.   Safety Equipment Funding for Nonpublic Schools. The Office of Religious and Independent Schools will continue to work with individual schools to ensure that they receive the entire amount of reimbursement for which they are eligible.

237.   TEACHER AND PRINCIPAL TRAINING AND RECRUITING FUND (ESEA/NCLB Title II A) ESEA/NCLB Title II, Part A provides funds to all NYS local education agencies (LEAs) for the purposes of meeting NCLB highly qualified teaching requirements, by: providing high quality professional development to ensure that teachers become, and remain, highly effective in helping all students to learn and achieve high performance standards; meeting 'highly qualified teacher' requirements for core course teaching through effective teacher recruitment, retention and professional development practices; and ensuring strong instructional leadership through effective principal recruitment, retention and professional development practices. The bulk of ESEA/NCLB Title II A funds (95%) are provided as formula allocations to LEAs.  ESEA/NCLB Title IIA is the second largest NCLB source of formula funding allocations (Title I is the largest) to LEAs.

238.   That the New York State Education Department (NYSED) maintains a public access website at http://www.p12.nysed.gov/nonpub/fundingopportunities/#mst and provides the following data on Defendant ST. MARY SCHOOL at https://portal.nysed.gov/pls/sedrefpublic/sed_inst_qry$inst.queryviewbykey?P_INST_ID=800000037184&Z_CHK=42337

 **SEDREF - Core Information on SED Institutions**

Home   Menu   General Query Search   Start New Search   Current List   Internal Help   Public Help   Login

## Institution Data

| | | | |
|---|---|---|---|
| Inst Id: | 800000037184 | Legal Name: | SAINT MARY SCHOOL |
| Popular Name: | ST MARY SCHOOL | Corporate Name: | DIOC ROCKVLL CNTR ST MARY |
| Label Name: | ST MARY SCHOOL | Type of Incorporation: | RELIGIOUS CORPORATION |
| Inactive?: | N | SED Code: | 580505173607 |
| Inst Type Desc: | NON-PUBLIC SCHOOLS | SED Code Effective Date: | 07/01/1980 |
| Inst Sub Type Desc: | ROMAN CATHOLIC ROCKVILLE CENTER DIOCESE | Grade Org Code: | 1 |
| Level 2 Tracking Code: | | Grade Org Desc: | Elementary |
| SORIS Inst ID: | 800000037184 | SORIS Inst Name: | ST MARY SCHOOL |
| OSE Reporting Inst ID: | | OSE Reporting Inst Name: | |
| | | Non Public Registration Code: | |
| County Code: | 58 | Non Public Registration Desc: | |
| County Desc: | SUFFOLK | School Dist Of Location: | 580505 |
| Dist Type Desc: | MAJOR | County of School Dist Code: | 58 |
| SDL Description: | EAST ISLIP UFSD | Record Type Code: | 2 |
| Active Date: | 07/01/1980 | Record Type Desc: | NON PUBLIC SCHOOL (IMF) |
| Inactive Date: | | Comm Dist Type: | LARGE CENTRAL DISTRICTS AND VILLAGE DISTRICTS |
| Needs Resource Code: | | Charter School Approval Code: | |
| Needs Resource Desc: | | Charter School Approval Desc: | |
| EDEN NCES LEA ID: | | EDEN NCES SCH ID: | |
| EDEN LEA Type: | | EDEN Sch Type: | |
| EDEN LEA Description: | | EDEN School Type Desc: | |
| EDEN LEA Op Status: | | EDEN Sch Op Status Code: | |
| EDEN LEA Op Status Desc: | | EDEN School Op Status Desc: | |
| SDW Indicator: | | CSE Placement Eligible: | |
| Medicaid Provider Number: | | Established Date: | 07/01/1980 |
| Successor INST Id: | | Successor Name: | |
| Sedfin ID: | | Parent Name: | DIOCESE OF ROCKVILLE CENTRE |
| OSC Vendor ID on SEDREF: | 1100015433 | OSC Vendor Status on SEDREF: | A |
| OSC Vendor Location on SEDREF: | | OSC Address Sequence Number on SEDREF: | |
| Payee Name on SEDREF: | ROMAN CATHOLIC CHURCH OF ST MARY | OSC Address Line 1: | DIOCESE OF ROCKVILLE CENTRE |
| OSC Address Line 2: | 50 NORTH PARK AVE PO BOX 9023 | OSC Address Line 3: | |

| Usage | Usage Ind |
|---|---|
| EDUCATIONAL TESTING INDICATOR | Y |
| FIRE CODE INDICATOR | Y |
| IMF INDICATOR | Y |
| NON-PUBLIC AID INDICATOR | Y |

Records 1 to 4 of 4

## Grades with Enrollment - SY 2016 - 17

| |
|---|
| GRADE 1 |
| GRADE 2 |
| GRADE 3 |
| GRADE 4 |
| GRADE 5 |
| GRADE 6 |
| GRADE 7 |
| GRADE 8 |
| FULL DAY KINDERGARTEN |
| PRE KINDERGARTEN |

Records 1 to 10 of 10

- History Information

County Info
School District of Location Info: BOCES, RIC, Census Data, etc.,

Home   Menu   General Query Search   Start New Search   Current List   Internal Help   Public Help   Login

| OSC City: | ROCKVILLE CENTRE | OSC State: | NY |
|---|---|---|---|
| OSC Zip: | 11571 | OSC Country: | USA |
| OSC Open For Ordering Flag: | Y | OSC Disabled Veteran Classification: | N |
| OSC Small Business Classification: | N | SED Approved For Payment: | Y |
| EFT Indicator on SEDREF: | | SED Interest Eligible: | Y |
| SED Not For Profit: | | DUNS Number on SEDREF: | 039414946 |
| CCR / Expiration Date on SEDREF: | 09/18/2018 | DUNS Verified: | Y |
| | | SED Payee Id: | 37183 |
| History Indicator: | | Owner: | INFORMATION AND REPORTING SERVICES |

### Address

| Address Type | Address Line 1 | Address Line 2 | City | State | Zip | Zip + 4 | Country | Foreign Postal Code | GIS Longitude (X) | GIS Latitude (Y) | OITS GIS Accuracy Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| MAILING | 16 HARRISON AVE | | EAST ISLIP | NY | 11730 | 2392 | US | | | | |
| PHYSICAL | 16 HARRISON AVE | | EAST ISLIP | NY | 11730 | 2392 | US | | -73.1953665997 | 40.7300029495 | 0 |
| CORPORATE | 50 N PARK AVE | | ROCKVILLE CENTRE | NY | 11570 | | US | | | | |

Records 1 to 3 of 3

### Institution Contacts

| Contact Type | Contact Value | Extension | Active Date | Inactive Date |
|---|---|---|---|---|
| US PHONE | (631)581-3423 | | 07/01/2010 | |
| US FAX | (631)581-7599 | | 06/04/2007 | |
| URL | www.saintmaryschool1.org | | 07/01/2008 | |

Records 1 to 3 of 3

### Administrative Positions

| Admin Pos Type | Title | First Name | Middle Initial | Last Name | Active Date | Inactive Date |
|---|---|---|---|---|---|---|
| 3-8 TESTING COORDINATOR | SCHOOL 3-8 TESTING COORDINATOR | BIAGIO | M | ARPINO | 01/26/2017 | |
| ADDITIONAL CONTACT | ADMINISTRATIVE ASSISTANT | JEANENE | | SLOANE | 10/21/2016 | |
| CHIEF EXECUTIVE OFFICER | PRINCIPAL | BIAGIO | M | ARPINO | 04/26/2002 | |
| CHIEF FINANCIAL OFFICER | MSA CFO | BIAGIO | M | ARPINO | 10/04/2007 | |
| INFORMATION OFFICER | SCHOOL DATA COORDINATOR | BIAGIO | M | ARPINO | 07/01/2010 | |

Records 1 to 5 of 5

### Usages

2 of 3                                                        5/27/18, 21:41

239.    Indeed the parents of students at St. Mary School were requested
        in a letter from Defendant Diocese of Rockville Centre to respond
        to an appeal distributed widely by electronic media from a
        Diocesan sponsored organization *Take Action for Catholic Schools*.
        The message stated:

"The New York State Legislature has returned from their President's week break and is moving forward in earnest with state budget negotiations. In addition to considering the tax benefits of the newly expanded 529 plans, lawmakers are also considering whether they can restore the "instructional time" standard in Mandated Services Reimbursement. If we don't fight to restore this well-established standard, our schools will see a cut in their much needed reimbursement."

"This link, Take Action for Catholic Schools, http://www.nyscatholic.org/nys-catholic-conference-action-center/?vvsrc=%2fcampaigns%2f56389%2frespond brings you to the action alert on our website. I strongly encourage you not only to personally follow-up on the action alert, but to also share this email and link far and wide throughout the Catholic school community. Together as diocesan staff, school principals, teachers, families and friends, our collective voice is considerable."
"Increased state support for our beloved Catholic schools is indeed possible but only if we all Take Action for Catholic Schools"

## 42 U.S.C. §§1985, 1986: CONSPIRACY

240.   Plaintiff URSULA MOORE has made a good faith effort to protect her son Plaintiff D.W.M. and exhausted all avenues of possible redress for the racist motivated cyberattack and cyberassaults upon his civil rights and liberty interests.

241.   Plaintiff URSULA MOORE went to everyone and no one did anything, upon information and belief, because the parents of the students who mounted the cyberassaults upon Plaintiff D.W.M. are prominent persons and that there was a collective failure to act albeit there was a known harm, potentially a crime, that occurred to which the Defendants acting under the custom and color of New York State in providing compulsory education, are collectively indifferent.

242.   Under normal circumstances the Plaintiffs might obtain some redress for the wrongs done to them from the police, but that was denied; the public prosecutors, but that was refused; the federal

government agency which claims they have no jurisdiction; and, lastly, the Defendants themselves. Unfortunately it appears that all of these institutions worked together to allow the deprivation of rights and threat to remain.

243. Defendants, individually and/or collectively, jointly and/or severally, conspired to deprive Plaintiff D.W.M., a black African American man and a duly enrolled graduating Eighth Grader at St. Mary School of his fundamental natural and civil rights which caused him serious and permanent injury and emotional damage.

244. That the conspiracy among the Defendants, individually and/or collectively, jointly and/or severally, was motivated by racial invidious discriminatory animus and all of the Defendants knew or should have known of the racist motivated cyberattack and cyberassaults upon the civil rights and liberty interests of Plaintiff D.W.M.

245. That the Defendants, individually and/or collectively, jointly and/or severally, had the authority and power to protect the Plaintiff D.W.M. and limit the injury and damage resulting from the racist motivated cyberattack and cyberassaults upon the civil rights and liberty interests of the infant Plaintiff, but they failed to do so.

246. That the Defendants, individually and/or collectively, jointly and/or severally, did not and still have failed to take appropriate action to protect the Plaintiff D.W.M. from the continuing racist motivated cyberattack and cyberassaults upon his civil rights and liberty interests.

247. Defendants, individually and/or collectively, jointly and/or severally, had an affirmative duty to protect Plaintiff D.W.M. from any racist motivated cyberattack and cyberassaults upon his civil rights and liberty interests.

248. Defendants, individually and/or collectively, jointly and/or severally, had an affirmative duty to protect Plaintiff D.W.M. from the injury and damage resulting from the racist motivated cyberattack and cyberassaults upon his civil rights and liberty interests.

249. Defendants, individually and/or collectively, jointly and/or severally, did conspire to deprive Plaintiff D.W.M., a black African

American graduating Eighth Grader at St. Mary School of his right to a canonically proper Catholic education set forth in the mission and vision statements of the Defendant St. Mary School and the Defendant Diocese of Rockville Centre which establish the contract for education between the Plaintiff URSULA MOORE and Plaintiff WILLIE MOORE as the parents and guardians of the infant Plaintiff D.W.M. and Plaintiff D.D.M. and Defendant St. Mary School and Defendant Diocese of Rockville Centre, the consideration for which was the tuition and fees paid and the declared divinely sanctioned moral mission of the Roman Catholic Church.

250. Defendants, individually and/or collectively, jointly and/or severally, refused to properly respond and act appropriately when the Edmond Family, Plaintiffs herein, demanded that charges be brought against the persons responsible for the racist motivated cyberattack and cyberassaults upon the civil rights and liberty interests of the Plaintiff D.W.M. which has caused him serious and permanent injury and damage.

## 42 U.S.C. §2000-D: *CIVIL RIGHTS ACT* TITLE VI

251. That Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre, individually and/or collectively, jointly and/or severally had actual knowledge of the racial hostility against and harassment of the infant Plaintiff D.W.M.

252. That the Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre, individually and/or collectively, jointly and/or severally, were deliberately indifferent to the harassment.

253. That the racially motivated racist cyberattack and cyberassaults upon the civil rights and liberty interests of Plaintiff D.W.M. was so egregiously outrageous and profoundly threatening as to establish *prima facie* severe and discriminatory harassment.

254. The failure of Defendants, individually and/or collectively, jointly and/or severally, to take action to prevent or remediate the effects of the racist motivated cyberattack and cyberassaults upon the civil rights and liberty interests of Plaintiff D.W.M. has created a separate and profoundly unequal educational experience for Plaintiff D.W.M. and his younger brother Plaintiff D.D.M. as

African American students.

255. The failure of Defendants, individually and/or collectively, jointly and/or severally, to take action to prevent or remediate the effects of the racist motivated cyberattack and cyberassaults upon the civil rights and liberty interests of Plaintiff D.W.M. was so severe, pervasive, and objectively offensive that it deprived the infant Plaintiffs D.W.M. and D.D.M. of access to the educational opportunities or benefits of the Roman Catholic elementary school education promised by Defendant St. Mary School and Defendant Diocese of Rockville Centre.

256. The failure of Defendants, individually and/or collectively, jointly and/or severally, to take action to prevent or remediate the effects of the racist motivated cyberattack and cyberassaults upon the civil rights and liberty interests of Plaintiff D.W.M. clearly evidences discrimination against him on the basis of race, that discrimination was intentional, and that the discrimination was a substantial or motivating factor for the failure of the Defendants, individually and/or collectively, jointly and/or severally, to take action to prevent or remediate the effects of the racist motivated cyberattack and cyberassaults upon the civil rights and liberty interests of Plaintiffs.

257. Defendants, individually and/or collectively, jointly and/or severally, by their failure to take action to prevent or remediate the effects of the racist motivated cyberattack and cyberassaults upon the civil rights and liberty interests of Plaintiff D.W.M. has created a racially discriminatory environment and school environment hostile to African American students such as Plaintiff D.W.M., and which effectively deprived him of access to a Catholic education.

258. Upon information and belief, Defendant St. Mary School is the recipient of federal funding.

259. Upon information and belief, Defendant Diocese of Rockville Center is the recipient of federal funding.

260. Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre, individually and/or collectively, jointly and/or severally, acting under the custom and color of New York State in providing compulsory education, exercised control over the students in St. Mary School who subjected D.W.M. to severe and

discriminatory harassment.

261.   Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre, individually and/or collectively, jointly and/or severally, acting under the custom and color of New York State in providing compulsory education, had actual knowledge of the severe and discriminatory harassment suffered by D.W.M. and acted with deliberate indifference to such harassment.

262.   Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre, individually and/or collectively, jointly and/or severally, acting under the custom and color of New York State in providing compulsory education, have actual knowledge of the severe and discriminatory harassment that D.W.M. continues to suffer and refuse to act to address such harassment and its known, true, threat of physical harm.

263.   Upon information and belief,  has demonstrated and continues to demonstrate patterns of racial/ethnic disproportionality in disciplinary actions including the historic failure to treat black/African American students who make complaints with equal respect, footing and action when those made by white students and, conversely, treat black/African American students as equal in discipline or the lack of therein.

## 42 U.S.C. §2000A: *CIVIL RIGHTS ACT* TITLE VI

264.   That by publicly claiming that it accepts any and all students without discrimination or segregation on the ground of race, color, religion, or national origin, Defendant ST. MARY SCHOOL has assumed the status of a place of public accommodation subject to the provisions of 42 U.S.C.A. §2000a.

265.   Defendant ST. MARY SCHOOL as a private Roman Catholic elementary school maintains no plan or purpose of exclusiveness but is willing to take tuition payments and fees together with other good and valuable consideration from the parents of the student seeking a Roman Catholic elementary school education.

266.   By requiring parents and students attending St. Mary School to accept the terms, conditions and policies set forth in the Parent-Student Handbook as a condition for enrollment and attendance, Defendant ST. MARY SCHOOL becomes subject to the effects of

42 U.S.C.A. §2000a and the terms and conditions of the Parent-Student Handbook.

267. Defendant ST. MARY SCHOOL publicly claims that it accepts any and all students without discrimination or segregation on the ground of race, color, religion, or national origin, treating everyone equal on the basis of race and addressing racially intolerant behavior, yet the instant case, and, upon information and belief, other examples, show that Defendant ST. MARY SCHOOL tolerates, condones and effectively facilitates disparate treatment of black/African American students to the extent that it allows students engage in racist behavior towards its black/African American members.

268. The Plaintiff Moore family relied upon the contractual obligations and claim that Defendant ST. MARY SCHOOL would not tolerate racism, bullying or harassment of black/African American students.

269. The Plaintiffs were injured and sustained damages in relying upon the representations of Defendant ST. MARY SCHOOL which represented that they would remedy an ongoing threat based upon color/race yet failed to act furthering the injury and damage by refusing to speak to the black/African American Plaintiff parents, while do nothing about the ongoing threat of harm and recent physical battery suffered by Plaintiff D.W.M.

270. The Plaintiffs were injured and sustained damages in relying upon the representations of Defendant ST. MARY SCHOOL to the extent of monies paid to Defendant ST. MARY SCHOOL for the purpose of obtaining a Roman Catholic Elementary School education for the infant Plaintiffs D.W.M. and D.D.M.

## PENDENT JURISDICTION

## NEGLIGENCE

271. Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre, individually and/or collectively, jointly and/or severally, had a duty to act reasonably and responsibly and not to act in a manner that would cause injury, harm, or the threat of harm to the Plaintiff D.W.M. nor permit other students to mount a racist motivated cyberattack and cyberassaults and cyberassault

upon his civil rights and liberty interests resulting in
psychological abuse.

272.    Defendants St. Mary School, Biagio M. Arpino, and the Diocese of
        Rockville Centre, individually and/or collectively, jointly and/or
        severally had a duty to act as careful and prudent custodians of
        the lives, health, and safety of the students entrusted to their care
        and custody *in loco parentis*, and not take any actions and not
        allow others to take any actions which would endanger the health,
        safety, or life of the Plaintiff D.W.M. or permit racist motivated
        cyberattack and cyberassaults upon his civil rights and liberty
        interests by other students.

273.    Defendants St. Mary School, Biagio M. Arpino, and the Diocese of
        Rockville Centre, individually and/or collectively, jointly and/or
        severally, were careless, negligent and reckless in protecting the
        health and safety of Plaintiff D.W.M. by, among other derelictions
        of duty, failing to supervise, and control access to the internet
        thus allowing the unprovoked and unjustified racist motivated
        cyberattack and cyberassaults upon the civil rights and liberty
        interests of Plaintiff D.W.M. causing him serious and permanent
        injury and damage.

274.     Defendants, individually and/or collectively, jointly and/or
        severally, were careless, negligent and reckless in protecting the
        health and safety of Plaintiff D.W.M. by, among other derelictions
        of duty, failing to properly investigate the  racist motivated
        cyberattack and cyberassaults upon the civil rights and liberty
        interests of Plaintiff D.W.M., and discipline those responsible,
        although Defendants knew or with the exercise of due care and
        diligence in their duties to the Plaintiffs should have known, of
        the ongoing and constant potential for such actions by the certain
        students.

275.    Defendants St. Mary School, Biagio M. Arpino, and the Diocese of
        Rockville Centre, individually and/or collectively, jointly and/or
        severally, can foresee harm coming to students by virtue of recent
        events, including but not limited to the Parkland School Shooting
        and the Santa Fe School Shooting.

276.    Knowing the foreseeability of harm coming to a student by
        another student, Defendants St. Mary School, Biagio M. Arpino,
        and the Diocese of Rockville Centre, individually and/or

collectively, jointly and/or severally, knew or should have known that white students communicated racist threats and images associated with death to Plaintiff D.W.M. required immediate action to prevent further injury and damage to the Moore family.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

277. Defendants, individually and/or collectively, jointly and/or severally, acted outrageously and beyond the bounds of decency in allowing, permitting, and facilitating an unprovoked and unjustified racist motivated cyberattack and cyberassaults upon the civil rights and liberty interests of Plaintiff D.W.M. by certain students which resulted in serious and permanent injury and damage causing the Plaintiff D.W.M. to suffer pain, shame, humiliation and anguish.

278. Defendants, individually and/or collectively, jointly and/or severally, knew or should have known, that their actions, lack of action, and neglect would cause emotional and physical harm to Plaintiff D.W.M., his brother Plaintiff D.D.M., and his parents.

279. Knowing the images received by D.W.M. evoke fear of physical harm and intimidation, Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre, individually and/or collectively, jointly and/or severally, knew and had reason to believe that the images created and communicated by the infants L.M., M.M., and M.J. created and established a racially hostile education and learning environment whereby the thought of death, fear of safety, and emotional damage to Plaintiff D.W.M. was imminent and ongoing should the threat not be removed.

280. Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre, individually and/or collectively, jointly and/or severally, knew or should have known after the recent School Shootings throughout the country know and have reason to know that it is a foreseeable event that a student can kill one or more of their classmates.

281. Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre, individually and/or collectively, jointly and/or severally, knew or should have known that when the infants L.M., M.M., and M.J. launched a cyberattack and cyberassaults against another student, Plaintiff D.W.M. by posting images of a noose, a

gun to D.W.M.'s head, and a Ku Klux Klan member raising the Nazi salute, there is a very real intimation of imminent violence.

282.   The Plaintiff Moore family fears for the safety of Plaintiff D.W.M. when the infants L.M., M.M., and M.J. are in school.

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

283.   Defendants, individually and/or collectively, jointly and/or severally, acted outrageously and beyond the bounds of decency in allowing, permitting, and facilitating an unprovoked and unjustified racist cyberattack and cyberassaults upon the civil rights and liberty interests of Plaintiff D.W.M. which resulted in emotional and physical harm to said Plaintiff and caused him and his family to suffer pain, shame, humiliation and anguish.

## PRIMA FACIE TORT

284.   Defendants, individually and/or collectively, jointly and/or severally, acted outrageously and beyond the bounds of decency by negligently and carelessly entrusting certain students with access to a dangerous instrumentality, the Internet, allowing, permitting, and facilitating those students in in allowing, permitting, and facilitating an unprovoked and unjustified racist motivated cyberattack and cyberassaults upon the civil rights and liberty interests of Plaintiff D.W.M. by certain students which resulted in serious and permanent injury and damage causing the Plaintiff D.W.M to suffer pain, shame, humiliation and anguish.

285.    Defendants, individually and/or collectively, jointly and/or severally, acted outrageously and beyond the bounds of decency in allowing, permitting, and facilitating an unprovoked and unjustified racist motivated cyberattack and cyberassaults upon the civil rights and liberty interests of Plaintiff D.W.M. which resulted in emotional and physical harm to said Plaintiff and caused him and his family to suffer pain, shame, humiliation and anguish.

## BREACH OF CONTRACT

286.   That the *Parent-Student Handbook*, together with other advertising, promotion and marketing materials addressed to all members of the general public without limitation or restriction

and which has been sanctioned and approved by Defendant St. Mary School and Defendant Diocese of Rockville Centre represents established policy of the Roman Catholic Church and constituted an offer to all parents to enroll their children in a Roman Catholic elementary school such as Defendant St. Mary School.

Plaintiff WILLIE MOORE and Plaintiff URSULA MOORE, by signing for and acknowledging receipt and understanding of the substance of that *Parent-Student Handbook*, accepted the offer of Defendant St. Mary School and Defendant Diocese of Rockville Centre and thereby entered into and established a contractual relationship with Defendant St. Mary School and by virtue of its hierarchal canonical relationship with Defendant Diocese of Rockville Centre, with the Diocese and the universal Roman Catholic Church.

287.   Plaintiff WILLIE MOORE and Plaintiff URSULA MOORE complied with all their obligations under the contract for education created by the Parent-Student Handbook.

288.   Defendant ST. MARY SCHOOL, breached the contract by depriving Plaintiff D.W.M., a black African American graduating Eighth Grader at St. Mary School, and indirectly Plaintiff D.D.M., a sixth grader of their individual right to a canonically proper Catholic education set forth in the mission and vision statements of the Defendant St. Mary School and the Defendant Diocese of Rockville Centre and the Parent-Student Handbook which establish the contract for education between the Plaintiff URSULA MOORE and Plaintiff WILLIE MOORE as the parents and guardians of the infant Plaintiff D.W.M. and Plaintiff D.D.M. and Defendant St. Mary School and Defendant Diocese of Rockville Centre, the consideration for which was the tuition and fees paid and the declared divinely sanctioned moral mission and *Magisterium* of the Roman Catholic Church.

289.   Defendants, individually and/or collectively, jointly and/or severally, did conspire to deprive Plaintiff D.W.M., a black African American graduating Eighth Grader at St. Mary School of his right to a canonically proper Catholic education set forth in the mission and vision statements of the Defendant St. Mary School and the Defendant Diocese of Rockville Centre which establish the

contract for education between the Plaintiff URSULA MOORE and Plaintiff WILLIE MOORE as the parents and guardians of the infant Plaintiff D.W.M. and Plaintiff D.D.M. and Defendant St. Mary School and Defendant Diocese of Rockville Centre, the consideration for which was the tuition and fees paid and the declared divinely sanctioned moral mission of the Roman Catholic Church.

290.   Defendants St. Mary School, Biagio M. Arpino, and the Diocese of Rockville Centre, individually and/or collectively, jointly and/or severally, acting under the custom and color of New York State in providing compulsory education,, acting under color of state law, have acted and inappropriately failed to act to prevent racist motivated cyberattack and cyberassaults upon the civil rights and liberty interests by fellow students and have deprived Plaintiff D.W.M., an African American citizen of African American heritage, and his parents, Plaintiff WILLIE MOORE and Plaintiff URSULA MOORE of a canonically proper Catholic education set forth in the mission and vision statements of the Defendant St. Mary School and the Defendant Diocese of Rockville Centre and the Parent-Student Handbook which establish the contract for education between the Plaintiff URSULA MOORE and Plaintiff WILLIE MOORE as the parents and guardians of the infant Plaintiff D.W.M. and Plaintiff D.D.M.

291.   That the Plaintiffs, individually and/or collectively, jointly and/or severally, have suffered serious, permanent, and irreparable injury, harm, and damage, by directly depriving Plaintiff D.W.M., a black African American graduating Eighth Grader at St. Mary School, and indirectly Plaintiff D.D.M. of their individual right to a canonically proper Catholic education set forth in the mission and vision statements of the Defendant St. Mary School and the Defendant Diocese of Rockville Centre and the Parent-Student Handbook which establish the contract for education between the Plaintiff URSULA MOORE and Plaintiff WILLIE MOORE as the parents and guardians of the infant Plaintiff D.W.M. and Plaintiff D.D.M. and Defendant St. Mary School and Defendant Diocese of Rockville Centre, the consideration for which was the tuition and fees paid and the declared divinely sanctioned moral mission and *Magisterium* of the Roman Catholic Church.

## PERSONAL INJURY AND DAMAGE

292. The unprovoked and unjustified racist motivated cyberattack and cyberassaults upon the civil rights and liberty interests of Plaintiff D.W.M. together with the actions of the Defendants, jointly and severally, individually and collectively, after the racist motivated cyberattack and cyberassaults and continuing to the present time, subjected the infant Plaintiffs D.W.M. and D.D.M. to great fear and terror, personal humiliation, degradation, pain, and mental and emotional distress.

293. As a direct and proximate result of the wrongful actions and inappropriate lack of action by the Defendants, individually and/or collectively, jointly and/or severally, Plaintiff D.W.M. has suffered injury and damages, including loss of educational and academic opportunities, mental and emotional distress, emotional and psychological harm, possible stunting of developmental growth, loss of self-esteem, severe anxiety, physical injuries, trauma, depression, loss of academic and future opportunities, public stigma, personal humiliation, social degradation,  and loss of the valuable and priceless educational well-being to which he is entitled as a child in the United States.

294. As a direct and proximate result of the wrongful actions and inappropriate lack of action by the Defendants, individually and/or collectively, jointly and/or severally, Plaintiff D.W.M. suffered emotional injury and damages with psychological and physical symptoms manifesting therefrom.

## DAMAGES FROM RACIAL/ETHNIC DISCRIMINATION

295. These patterns of discrimination represent significant limitations upon the educational progress of Black students such as Plaintiffs D.W.M. and D.D.M. including short and long term negative effects on their physical, mental, and emotional health and well-being.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs request an Order of Protection from this Court directed toward L.M., M.J., and M.M. and their entire families; together with a further Order of this Court

DIRECTING St. Mary Elementary School to immediately remove

L.M., M.J., and M.M. from the School premises so long as Plaintiff D.W.M. or his younger sibling are students at the School.

**DIRECTING** Defendants to take all actions necessary to immediately remove permanently any images or content referring to Plaintiff D.W.M. or any member of the Moore family from any electronic or other form of media.

**DIRECTING** Defendants to take all actions necessary to immediately and permanently remove any images or content referring to Plaintiff D.W.M. or any member of the Moore family from any device including, but not limited to laptops, tablets, other mobile devices, and storage devices.

**DIRECTING** Defendants to **DELETE** any and all internet or social media accounts to which the Defendants have access which have been accessed by or may be capable of being accessed by L.M., M.J., and M.M.

**DIRECTING** Defendants to **DELETE** any and all images or content from any internet or social media sites maintained by or to which the Defendants may have access.

**DIRECTING** Defendant Diocese of Rockville Centre to immediately enroll D.D.M. in SS Cyril & Methodius Elementary School for the Fall term, 2018.

**DIRECTING** Defendant Diocese of Rockville Centre to immediately enroll D.W.M. in Holy Trinity Diocesan High School for the Fall term, 2018.

**DIRECTING** Defendant Diocese of Rockville Centre to assure admission and enrollment of D.D.M. in Holy Trinity Diocesan High School upon his graduation from SS Cyril & Methodius Elementary School.

**PROHIBITING** L.M., M.M. and M.J. from attending Holy Trinity High School so long as D.W.M. or D.D.M. are students at the school.

**PROHIBITING** L.M., M.J., and M.M. or any members of their family from attending Ss. Cyril and Methodius School so long as D.D.M. shall be a student at that school.

**DIRECTING** Defendants to immediately promulgate and implement a formal Diocese wide policy of Zero Tolerance for

bullying any kind, racial hatred, and hate speech.

**DIRECTING** Defendants to immediately promulgate and implement a formal Diocese wide mandatory education program for administrators, teachers, and students about bullying, racial intolerance, and hate speech.

**DIRECTING** Defendants to immediately refund and return all the tuition payments made for the education of D.W.M. and D.D.M. at St. Mary Elementary School.

**DIRECTING** Defendants to establish a fully funded and insured Trust fund for the benefit of the Moore family and provide the following benefits from such trust fund:

1. Lifetime medical care and treatment for any and all conditions, physical or mental, sustained by any of the Plaintiffs which result from or may be attributable to the events which are the subject of this litigation.
2. Payment of any and all costs and expenses associated with the relocation of D.W.M. and D.D.M. to new schools.
3. Full scholarship awards including tuition, room, board, books, and incidental living and travel expenses for D.W.M. and D.D.M. from now until they complete their education at the level of their choice including post-doctoral studies at the institutions of their choice.
4. Just compensation for the general damages suffered by the Plaintiffs.
5. Reimbursement of any and all legal expenses incurred by the Plaintiff including attorney's fees.

**PROVIDING** such other and further equitable relief as may be appropriate under the circumstances;

**AWARDING** just compensation to the Plaintiffs as appropriate general and compensatory damages in an amount to be determined at trial;

**AWARDING** appropriate punitive damages sufficient to deter other private school administrators and employees from acting against African American student in a reprehensible manner similar to the way said Defendants acted against Plaintiff D.W.M. as described herein;

**AWARDING,** pursuant to 42 U.S.C. §988, fair and reasonable

attorneys' fees together with the costs and disbursements and reimbursement of all the expenses incurred by the Plaintiffs and their attorneys in the prosecution of this action of this action;

**THE REMAINDER OF THIS PAGE HAS BEEN LEFT INTENTIONALLY BLANK**

All together with such other and further relief as to this Court
shall seem just and proper under the circumstances.

**A jury trial is hereby demanded**

DATED AT   Dix Hills, New York
            1 June 2018


CORY H. MORRIS (CM 5225)

THE LAW OFFICES OF CORY H. MORRIS
*Attorney for the Plaintiffs*
Office & P.O. Address
33 Walt Whitman Rd, *suite* 310
Dix Hills, New York 11749
Phone: (631) 450–2515
FAX: (631) 223–7377
email Cory.H.Morris@protonmail.com

VICTOR JOHN YANNACONE, JR. (VY6405) *of counsel*
Phone: (631) 4705–0231
email barrister@yannalaw.com


TO:   THOMAS RENKER, Esq., *General Counsel*
      Defendant Diocese of Rockville Centre
      50 North Park Ave.
      PO Box 9023
      Rockville Centre, NY 11571–9023
      516-678-5800 Ext. 241
      email: trenker@drvc.org

JOSEPH MICHAEL NADOR, ESQ.
jmnador@pfapc.com,
PATRICK F. ADAMS, PC
3500 Sunrise Highway, *Suite 300*
Great River, NY 11739
Phone: 631–666–6200

# PARENTS' VERIFICATIONS

State of New York
County of Suffolk    } ss:

WILLIE MOORE and URSULA MOORE , each severally being duly sworn, deposes and says that they and each of them are the Plaintiffs in the within action and that they have read the foregoing complaint and that the allegations of fact contained therein are true except as to those portions therein stated to be alleged upon information and belief, and as to those allegations each of us believes them to be true.


s/ *Willie Moore* /s
_____
WILLIE MOORE


_____
URSULA MOORE


Sworn on this
1st day of June 2018


_____

# PARENTS' VERIFICATIONS

State of New York }
County of Suffolk } *ss*:

WILLIE MOORE and URSULA MOORE , each severally being duly sworn, deposes and says that they and each of them are the Plaintiffs in the within action and that they have read the foregoing complaint and that the allegations of fact contained therein are true except as to those portions therein stated to be alleged upon information and belief, and as to those allegations each of us believes them to be true.

_____
WILLIE MOORE

_____
s/ *Ursula Moore* /s
URSULA MOORE

Sworn on this
1st day of June 2018

_____

Second Amended Verified Complaint 1 June 2018                     75