UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
D.W.M., a minor by Willie Moore, his father
and Ursula Moore, his mother, D.D.M., a
minor by Willie Moore, his father, and Ursula
Moore, his mother, WILLIE MOORE,
and URSULA MOORE,

                          Plaintiffs,                        **MEMORANDUM AND ORDER**
                                                   2:18-cv-3099 (DRH)(GRB)

        - against –

ST. MARY SCHOOL, BIAGIO M. ARPINO,
Principal of St. Mary School, THE
ROMAN CATHOLIC DIOCESE OF
ROCKVILLE CENTRE, KERRI
LECHTRECKER, individually and as the
mother of L.M., an infant, MIKE JONES and
CHRISTINE JONES, individually and as
as parents and natural guardians of M.J., an
infant, and KRZYSZTOF MARS and
and DOROTA MARS, individually and as the
parents and natural guardians of M.M., an
infant,

                          Defendants.
--------------------------------------------------------X

**APPEARANCES**

**LAW OFFICES OF CORY H. MORRIS**
Attorney for all Plaintiffs
33 Walt Whitman Rd Suite 310
Dix Hills, NY 11746
By:    Cory H. Morris, Esq.

**YANNACONE & YANNACONE PC**
Attorney for Plaintiffs D.W.M. and D.D.M.
P.O. Box 109
Patchogue, NY 11772
By:    Victor John Yannacone, Jr., Esq.

**PATRICK F. ADAMS, P.C.**
Attorney for Defendants St. Mary School, Biagio M. Arpino, and The Roman Catholic Diocese
of Rockville Centre
3500 Sunrise Highway Building 300
Great River, NY 11739
By:     Joseph M. Nador, Esq.

**JOHN RAY & ASSOCIATES**
Attorneys for Defendant Kerri Lechtrecker
122 N. County Road
Miller Place, NY 11764
By:     Vesselin Venelinov Mitev, Esq.
         John W. Ray, Esq.

**GUERCIO & GUERCIO, LLP**
Attorneys for Defendants Mike Jones and Christine Jones
77 Conklin Street
Farmingdale, NY 11753
By:     Christopher Mestecky, Esq.
         Anthony J Fasano, Jr., Esq.

**TIERNEY & TIERNEY**
Attorney for Defendants Krzysztof Mars and Dorota Mars
409 Route 112
Port Jefferson Station, NY 11776
By:     Stephen A. Ruland, Esq.

**HURLEY, Senior District Judge:**

## INTRODUCTION

Plaintiffs Ursula Moore and Willie Moore, individually and on behalf of their infant sons,

D.W.M. and D.D.M. ("Plaintiffs"), brought the instant action against Defendants St. Mary

School ("St. Mary"), Biagio M. Arpino ("Arpino"), The Roman Catholic Diocese of Rockville

Centre (the "Diocese," collectively with St. Mary and Arpino, the "School Defendants"), Kerri

Lechtrecker, individually and as the mother of L.M., an infant, Mike Jones and Christine Jones,

individually and as parents and natural guardians of M.J., an infant, and Krzysztof Mars and

Dorota Mars, individually and as the parents and natural guardians of M.M., an infant

(collectively with the School Defendants, "Defendants"), for violations of the Federal Civil

Rights Act.  Additionally, Plaintiffs bring state law claims of negligence, intentional infliction of emotional distress, negligent infliction of emotional distress, prima facie tort, and breach of contract.  Presently before the Court are Defendants' motions to dismiss the Complaint pursuant to Fed. R. Civ. P. ("Rule") 12(b)(1) for lack of subject matter jurisdiction, and Rule 12(b)(6) for failure to state a claim.  For the reasons explained below, the motions to dismiss pursuant to Rule 12(1)(1) are denied, and the motions pursuant to Rule 12(b)(6) are granted in part and denied in part.

## BACKGROUND

The following relevant facts come from the Fifth Amended Complaint[1] and are assumed true for purposes of these motions.

Plaintiff D.W.M. is an African American male child.  (Fifth Am. Compl. [ECF No. 27] ¶ 28.)  At the time of the cyberassault later described, Plaintiff D.W.M. was approximately thirteen or fourteen years of age, and was about to graduate from the eighth grade at St. Mary. (*Id*.)  Plaintiff D.D.M. is an African American male child who was eleven years of age, and a student in the sixth grade at St. Mary at the time of the cyberassault.  (*Id*. ¶ 30)  Plaintiff D.W.M. and Plaintiff D.D.M. are brothers.  (*Id*.)  Plaintiffs Ursula Moore and Willie Moore are parents of the infants D.W.M. and D.D.M.  (*Id*. ¶¶ 32–33.)

Defendant St. Mary is a Catholic elementary and middle school in East Islip, New York that is under the jurisdiction and control of Defendant the Diocese.  (*Id*. ¶ 36.)  Defendant Mr. Arpino is the Principal of St. Mary.  (*Id*. ¶ 58.)  Infants L.M., M.M., and M.J. were classmates of

---

[1] Incorrectly named the re-re-filed Second Amended Verified Complaint on the docket, which was in fact re-filed multiple times under the same name.  To avoid confusion, the relevant pleading is referred to as the Fifth Amended Complaint herein.

Plaintiff D.W.M. at St. Mary at the time of the incident and filing of the Complaint.  (*Id*. ¶¶ 62, 64 66.)

      The events giving rise to this action occurred on December 7, 2017 and April 12, 2018. (*Id*. ¶¶ 90–110.)  On December 7, 2017, the student L.M. launched a cyberassault against Plaintiff D.W.M. by posting numerous denigrating images on one or more "*Discord*" channels under the alias, "Jared."  (*Id*. ¶ 101.) (emphasis in original).  *Discord* is identified as a text and voice platform for video game players, which contains 12,000 real-time chat roo ms for online users to communicate.  (*Id.* ¶ 73.)  Once L.M. launched his cyberassault via *Discord*, both M.M. and M.J. reposted the images to their *Discord* channels as well as to one or more other channels. (*Id*. ¶ 76.)  M.M. subsequently transmitted one or more of the cyberassault images through an email account associated with St. Mary, and claimed the images were for a school project.  (*Id*. ¶ 110.)

      The cyberassault consisted of eight disturbing images.  (*Id*. ¶¶ 90–110.)  The first image, sent on December 7, 2017, depicted a "Minion" (a small, yellow creature from the movie "Despicable Me") next to the words: "Black People Are Not Functioning Members Of Society" written down the right-hand side of the image.  (*Id*. ¶ 90.)  The second image, also sent on December 7, 2017, displayed what appeared to be a young male holding a gun to his head.  (*Id*. ¶ 91.)  The caption of the second image read: "how to cure autism really fast."  (*Id*.)  Plaintiff D.W.M. claims that he perceived the image "as a threat that if he did not commit suicide the cyberbullies L.M., M.J., and M.M., individually and/or collectively, jointly and/or severally, would kill him themselves just because he was a black African American."  (*Id*.)  The third image, sent the same day, was a TV news headline featuring a noose, and the caption: "Man Dies After Killing Himself."  (*Id*. ¶ 94.)  After receiving the third image, Plaintiff D.W.M. says that he

lived in a constant state of fear, as he interpreted the image to be an "overt threat of being

lynched." (*Id.*)  The fourth and final cyberassault image sent on December 7, 2017 depicted a

"Ku Klux Klansperson in a white sheet and hood with their arm raised in the 'Seig Heil' Nazi

salute signaling obedience and devotion to the party leader Adolf Hitler . . . ." (*Id.* ¶ 97.)  Below

the image of the hooded figure, L.M. wrote the comment: "he my dad." (*Id.*)  Plaintiff D.W.M.

states that he did not report the cyberassault of December 7, 2017, to St. Mary or his parents

because he was fearful and intimidated.  (*Id.* ¶ 102.)

The remaining four cyberassault images were sent on April 12, 2018.  (*Id.* ¶¶ 97–109.)

The fifth image was titled "[D.W.M.]_kill," and depicted two cartoon characters engaged in

combat.  (*Id.* ¶ 104.)  Plaintiff D.W.M.'s face was superimposed onto the body of one of the

cartoon characters.  (*Id.*)  The sixth cyberassault image, entitled "[D.W.M.]_is_the_trash_man,"

illustrated Plaintiff D.W.M.'s face inside of a trashcan.  (*Id.* ¶ 106.)  The seventh image showed a

male holding a gun to the side of his head, and was given the title "[D.W.M.]_oof." (*Id.* ¶ 107.)

Plaintiff D.W.M.'s face was photoshopped onto the body of the male depicted in the seventh

image.  (*Id.*)  Plaintiffs explain that "oof" is the noise made by a dying player of "Roadblocks," a

computer game well known to adolescent males.  (*Id.* ¶ 108.)  The eighth, and final cyberassault

image, portrayed Plaintiff D.W.M.'s face on the body of a saluting Nazi soldier.  (*Id.* ¶ 109.)

Believing that his life was in danger, D.W.M. showed the cyberassault images to his

mother, Plaintiff Ursula Moore, on April 13, 2018.  (*Id.* ¶ 111.)  Plaintiff Ursula Moore

immediately sent an email to Theresa Gelling, the seventh and eighth grade science teacher at St.

Mary.  (*Id.* ¶ 112.)  On April 14, 2018, Ms. Gelling responded to Plaintiff Ursula Moore's email,

and stated: "I immediately sent an email to L.[M.]'s mother telling her that she must have him

remove these images at once.  I also requested that she go through all of L.[M.]'s previous

postings as well.  I have notified both Mr. Arpino and Mrs. Ceramello."  (*Id*. ¶ 113.)  After

receiving the email from Ms. Gelling, Plaintiff Ursula Moore had a meeting with the technology

administrator of St. Mary and the Diocese Technology Representative on April 16, 2018.  (*Id*.

¶ 117.)  That same day, Plaintiff Ursula Moore was informed of infant M.M.'s and M.J.'s

involvement in the cyberassault.  (*Id*. 116.).  Ms. Moore was also told infant L.M. made some

type of admission regarding the attack, the exact details of which the Parties have not disclosed

to the Court.  (*Id*.)

On April 20, 2018, Defendant Mr. Arpino responded by letter to Plaintiff Ursula Moore's

concerns.  (*Id*. ¶ 118.)  The letter stated that St. Mary took immediate steps to ensure Plaintiff

D.W.M.'s safety, and to separate Plaintiff D.W.M. from the "boy he was most concerned with

for the remainder of the year."  (*Id*.)  Additionally, the letter claimed that: "[a]ll students

involved were given appropriate consequences . . . .  All teachers and staff members working

with these students have been told to oversee the students to prevent future negative interactions

whenever possible."  (*Id*.)  Furthermore, Plaintiff Ursula Moore was informed that: "[her] son

was given a plan to follow to ensure he has a means to be proactive should he feel unsafe."  (*Id*.)

Plaintiff Ursula Moore asserts that the "plan" provided to Plaintiff D.W.M. was solely a

suggestion that he speak up when he feels he is being bullied.  (*Id*. ¶ 124..)  Plaintiffs aver that no

meaningful or effective steps were taken to ensure a "sense of safety" for Plaintiff D.W.M., and

that L.M., M.M., and M.J. were never separated from D.W.M. or removed from St. Mary at any

time.  (*Id*. ¶¶ 123–26.)

Plaintiffs claim that Defendants are collectively, or severally, engaged in a conspiracy to

cover up the cyberassault against Plaintiff D.W.M to protect the "image" of St. Mary and to

shield the parents of the infant L.M.  (*Id*. ¶ 134.)  Plaintiffs Ursula and Willie Moore believe

L.M. is being protected from disciplinary action and expulsion because of the position and status of his family.  (*Id.* ¶ 133.)  Apparently, the School Defendants have protected L.M. from the consequences of his anti-social behavior in the past.  (*Id.* ¶ 135.)  Further, Plaintiffs allege that the School Defendants covered up the cyberassault because Defendants St. Mary and the Diocese could lose federal funding should they disclose the discriminatory treatment of Plaintiff D.W.M. (*Id.* ¶ 31.)

As a result of the cyberassault, Plaintiffs assert that D.W.M. and D.D.M. have been subjected to "great fear and terror, personal humiliation, degradation, pain, and mental and emotional distress."  (*Id.* ¶ 292.)  Additionally, following the racially motivated attacks, Plaintiff D.D.M. felt so unsafe that he left St. Mary to attend another elementary school in a different area.  (*Id.* ¶ 30.)

Plaintiffs commenced this action by Order to Show Cause on May 25, 2018, asking the Court to direct the School Defendants to remove L.M., M.M., and M.J. from the school premises, and take all actions necessary to remove any online content related to the cyberassault from technological devices on the school premises.  (Pls.' Order to Show Cause [ECF No. 2] at 1.)  At the Court's direction, Plaintiffs re-filed their Order to Show Cause on May 29, 2018, substituting the infants' names with pseudonyms and adding their parents as parties.  (Pls.' Corrected Order to Show Cause [ECF No. 7] at 1.)  On May 30 and June 7, 2018, the Court held hearings.  The Court ultimately denied the requested relief in the Order to Show Cause, and entered the following Order

> As discussed in the Order to Show Cause Hearing before the undersigned on May 30, 2018, the Court will not entertain a hearing on this matter until all parties have been appropriately served in accordance with Fed. R. of Civ. P. 4 and 5, and have either entered a Notice of Appearance, answered, otherwise moved, or their time to do so has expired in accordance with Fed. R. of Civ. P. 12(a). The

> time for the parties to appear, answer, or move has not yet expired.
> Furthermore, the three infant parties have not been served with the
> Order to Show Cause moving papers in accordance with Fed. R. Civ.
> P. 5(a)(1)(D).

(Ordered dated June 7, 2018.)  Defendants later filed separate requests for leave to file respective

motions to dismiss.  After resolving an issue regarding service, Defendants renewed their

request, and the Court granted such leave and set a briefing schedule.  The motions to dismiss

were filed on November 9, 2018.

## DISCUSSION

### I.    *The Parties' Arguments*

In the Fifth Amended Complaint, Plaintiffs set forth the following ten claims:

(1) violations of 42 U.S.C. § 1981 by the School Defendants for failing to give Plaintiff "equal

benefit of the school contract, resources, and compulsory education that white[] [people] did

receive[;]" (2) violations of 42 U.S.C. § 1983 by the School Defendants for denial of equal

protection, violating bodily integrity, and improper supervision; (3) violations of 42 U.S.C.

§§ 1985, 1986 by all Defendants for conspiracy; (4) violations of 42 U.S.C. § 2000a by the

School Defendants as a place of public accommodation for failure to remedy the racist behavior

of students; (5) violations of 42 U.S.C. § 2000d by Defendant St. Mary School for failing to take

action to prevent or remediate the racist motivated attacks; (6) negligence against the School

Defendants; (7) intentional infliction of emotional distress against all Defendants; (8) negligent

infliction of emotional distress against all Defendants; (9) prima facie tort against all Defendants;

and (10) breach of contract against the School Defendants.

In response to the Fifth Amended Complaint, the parents of each of the infant defendants

filed three separate motions to dismiss pursuant to Rule 12(b)(6).  Defendants Krzystof and

Dorota Mars also brought their motion to dismiss pursuant to Rule 12(b)(1).[2]  The School

Defendants jointly filed a fourth motion to dismiss, pursuant to both Rule 12(b)(1) and 12(b)(6).

To the extent that the individual defendants' motions discuss claims that are only brought against

the School Defendants, such arguments will not be considered or addressed herein.

The Court will first consider whether it has subject matter jurisdiction.

II.     *The Motions to Dismiss Pursuant to Rule 12(b)(1) Are Denied*

A.  Rule 12(b)(1) Legal Standard

A case may properly be dismissed for lack of subject matter jurisdiction pursuant to Rule

12(b)(1) "when the district court lacks the statutory or constitutional power to adjudicate it."

*Makarova v. United States*, 201 F.3d 110, 113 (2d Cir.2000).  "In contrast to the standard for a

motion to dismiss for failure to state a claim under Rule 12(b)(6), a 'plaintiff asserting subject

matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists.'"

*MacPherson v. State St. Bank & Trust Co.*, 452 F. Supp. 2d 133, 136 (E.D.N.Y. 2006) (quoting

*Reserve Solutions Inc. v. Vernaglia*, 438 F. Supp. 2d 280, 286 (S.D.N.Y. 2006)), *aff'd*, 273 F.

App'x 61 (2d Cir. 2008); *accord Tomaino v. United States*, 2010 WL 1005896, at *1 (E.D.N.Y.

Mar. 16, 2010).  "In resolving a motion to dismiss for lack of subject matter jurisdiction, the

Court may consider affidavits and other materials beyond the pleadings to resolve jurisdictional

questions."  *Cunningham v. Bank of New York Mellon, N.A.*, 2015 WL 4101839, * 1 (E.D.N.Y.

July 8, 2015) (citing *Morrison v. Nat'l Australia Bank, Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008)).

---

[2] Defendants Krzystof and Dorota Mars also included a Rule 12(f) motion to strike.  The Court declines to
consider this motion, as it was untimely under Rule 12(f)(2) given that it was filed more than 21 days
after such Defendants were served with the Fifth Amended Complaint.  Furthermore, the Rule 12(f)
motion was not mentioned in their request for a pre-motion conference that was filed on June 25, 2019 at
ECF No. 47.  The motion is also effectively moot, given that the majority of the claims are dismissed
herein and the Court has clarified which remaining claims apply to which remaining Defendants.

B.   The Motions to Dismiss Pursuant to Rule 12(b)(1) Are Denied

Defendants Krzystof and Dorota Mars argue in their motion to dismiss that the Court does not have subject matter jurisdiction over Plaintiffs' § 1983 claim against the School Defendants.  This claim was not brought against Defendants Krzystof and Dorota Mars, and dismissing the § 1983 claim on this ground would have no impact on the claims that have been brought against Krzystof and Dorota Mars.  Furthermore, the Court's subject matter jurisdiction over Plaintiff's § 1983 claim has no bearing on its subject matter jurisdiction over this case per se given that there are other viable federal claims.  Their Rule 12(b)(1) argument is also redundant of the Rule 12(b)(6) failure to state a claim argument that is discussed below.  Accordingly, Defendants Krzystof and Dorota Mars' motion to dismiss Plaintiffs' § 1983 claim for lack of subject matter jurisdiction is denied.

The School Defendants state in the introduction to their Memorandum of Law that their motion is brought pursuant to Rules 12(b)(1) for lack of subject matter jurisdiction, and 12(b)(6) for failure to state a claim.  (School Def.'s Mem. in Supp. [ECF No. 78-1] at 1.)  Neither "12(b)(1)" nor "subject matter jurisdiction" are ever mentioned again in the rest of the Memorandum, except in the conclusion which states that the Court should grant the School Defendants' motion to dismiss pursuant to 12(b)(1) and 12(b)(6).  (*Id.* at 19.)  The same is true of the School Defendants' Reply Memorandum of Law.  (*See* School Def.'s Reply Mem. in Further Supp. [ECF No. 78-11] at 1, 11.)  Accordingly, the School Defendants' motion to dismiss pursuant to Rule 12(b)(1) is denied as abandoned.

III.   *The Motions to Dismiss Pursuant to Rule 12(b)(6) Are Granted in Part and Denied in Part*

A.  Rule 12(b)(6) Legal Standard

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in Plaintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted).  The plausibility standard is guided by two principles.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007)); *accord Harris v. Mills*, 572 F.3d 66, 71–72 (2d Cir. 2009).

First, the principle that a court must accept all allegations as true is inapplicable to legal conclusions.  Thus, "threadbare recitals of the elements of a cause of action supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  Although "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Id.* at 679.  A plaintiff must provide facts sufficient to allow each named defendant to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery.  *See Twombly*, 550 U.S. at 555, 127 S. Ct. 1955.

Second, only complaints that state a "plausible claim for relief" can survive a motion to dismiss.  *Iqbal,* 556 U.S. at 679.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a 'probability requirement,' but asks for more than a sheer possibility that defendant acted unlawfully.  Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line' between possibility and plausibility of 'entitlement to relief.'"  *Id.* at 678 (quoting *Twombly*, 550 U.S. at

556-57, 127 S. Ct. 1955) (internal citations omitted); *see In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007). Determining whether a complaint plausibly states a claim for relief is "a context specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *accord Harris*, 572 F.3d at 72.

      B. The Motion to Dismiss Plaintiffs' § 1981 Claim Against the School Defendants is
         Granted

        1. Relevant Law

Section 1981 establishes that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens[.]" 42 U.S.C. § 1981(a). The statute "prohibits both public and private actors from discriminating on the bais of race[.]" *Juarez v. Northwestern Mut. Ins. Co., Inc.*, 69 F. Supp. 3d 364, 367 (S.D.N.Y. 2014).

To state a § 1981 claim, a party must plead facts showing: "(1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute." *Murray v. NYC Dep't of Correction*, 2016 WL 5928672, at *3 (E.D.N.Y. Sept. 30, 2016) (quoting *Jones v. J.C. Penney's Dep't Stores, Inc.*, 2007 WL 1577758, at *18 (W.D.N.Y. May 31, 2007), *aff'd sub nom. Jones v. J.C. Penny's Dep't Stores Inc.*, 317 Fed. App'x. 71 (2d Cir. 2009)) (internal quotation marks omitted). "[Section] 1981, like the Equal Protection Cause, can be violated only by purposeful discrimination." *Juarez*, 69 F. Supp. 3d at 367 (quoting *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 291, 102 S. Ct. 3141, 73 L.Ed.2d 835 (1982)). "Purposeful discrimination is 'conduct motivated by a discriminatory purpose,' rather than conduct that 'merely result[s] in a disproportionate impact on a particular class.'" *Id.*

As such, "[n]aked assertions by a plaintiff that race was a motivating factor—without a fact specific allegation of a causal link between a defendant's conduct and the plaintiff's race—are too conclusory to allege a § 1981 violation." *Sherwyn Toppin Marketing Consultants, Inc. v. City of New York*, 2013 WL 685382, at *4 (E.D.N.Y. Feb. 25, 2013) (quoting *Hargett v. N.Y.C. Transit Auth.*, 640 F. Supp. 2d 450, 473 (S.D.N.Y. 2009)) (internal quotation marks omitted).

## 2.   The Parties' Arguments

Plaintiffs claim that they entered into a contract with the School Defendants by signing and acknowledging receipt of the Parent-Student Handbook.  (Fifth Am. Compl. ¶¶ 195–96.) The Parent-Student Handbook states that "St. Mary School is dedicated to nurturing students in the Catholic Faith as they pursue academic excellence [and] strive[s] to empower each student to discover their unique abilities and enhance their self-worth."  (*Id.* ¶ 209.)  The Parent-Student Handbook further provides that:

> All children have the right to attend school in a safe, welcoming, and caring environment free from harassment and discrimination. . . .  The school curriculum and programs are built on strong instruction in civility[;] citizenship and character education is standard curriculum in our schools, with a strong emphasis on principles of honesty, tolerance, personal responsibility, respect for others, observance of the laws and rules, courtesy, and dignity and respect for all.  Faculty, staff, and student behavior is expected to conform to values consistent with the Catholic faith.

(*Id.* ¶ 213.)  The Parent-Student Handbook also includes a "Harassment and Bullying Policy" that provides that:

> Harassment or bullying is defined as acts or behaviors repeated over time that involve a real or perceived imbalance of power.  Any gesture whether written, verbal, graphic, or a physical act (including electronically transmitted acts: i.e. internet, cell phone, wireless hand held device, website or social networking site) will be considered a violation of this policy. . . . Types of harassing or bullying behaviors include: . . . Obvious and hidden acts of aggression towards another student such as threats, putdowns, and name calling.  St. Mary School will not tolerate the use of ethnic or racial remarks directed towards anyone.

(*Id.* ¶ 214.)  Plaintiffs argue that the "racist motivated cyberattack and cyberassaults upon the civil rights and liberty interests of Plaintiff D.W.M. were explicit violations of the contract between [Plaintiffs] and Defendant St. Mary School[.]"  (*Id.* ¶ 215.)  Plaintiffs further allege that the School Defendants have, "by their actions and inappropriate lack of action denied and deprived the Plaintiffs of their Constitutional rights" and that "Defendants appear to have been motivated by illegal considerations of race, national origin, and color."  (*Id.* ¶ 221.)  Finally, Plaintiffs state that "[t]he protection from racist motivated cyberattack[s] and cyberassaults upon the civil rights and liberty interests of Plaintiff D.W.M. is conduct explicitly prohibited by the contract created by the Parent-Student Handbook."  (*Id.* ¶ 222.)

The School Defendants respond that Plaintiff D.W.M. "was not denied anything" and that the Parent-Student handbook "does not provide for specific consequences or disciplinary actions with respect to the conduct complained of in this action, or any misconduct for that matter." (School Def.'s Mem. in Supp. at 13.)

3.   Plaintiffs' § 1981 Claim is Dismissed

There is no dispute here that Plaintiffs have met the first element of a § 1981 claim. However, Plaintiffs fare less well with regards to the second and third elements.  As to the second element, there are no facts in the Fifth Amended Complaint suggesting that the School Defendants had an intent to discriminate on the basis of race, other than Plaintiffs' conclusory assertion that "Defendants appear to have been motivated by illegal considerations of race, national origin, and color."  (*Id.* ¶ 221.)  This is nothing more than a "mere conclusory statement[]" or "[t]hreadbare recital[] of the elements of a cause of action," which is insufficient to state a claim.  *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955.

Regarding the third element, Plaintiffs barely make out that Defendants have interfered with their rights to make or enforce a contract, if at all.  The "Harassment and Bullying Policy" in the Parent-Student Handbook does not provide for specific consequences or disciplinary actions.  Rather, the Parent-Student Handbook simply states that "St. Mary School will not tolerate the use of ethnic or racial remarks directed towards anyone."  (Fifth Am. Compl. ¶ 214.) It does not guarantee that students who make ethnic or racial remarks will be separated from other students, suspended, or expelled.  For that matter, the School Defendants allegedly took the actions that they felt were appropriate, even if this was insufficient in Plaintiffs' estimation.  As explained in the letter from Defendant Arpino that is quoted in the Fifth Amended Complaint, "[a]ll students involved were questioned . . . [s]teps were taken to separate [Plaintiff D.W.M.] from the boy he was most concerned with for the remainder of the year . . . [and] [a]ll teachers and staff members working with these students have been told to oversee the students to prevent future negative interactions whenever possible[.]"  (*Id.* ¶ 118.)  Plaintiffs contest that "[n]o meaningful or effective separation was ever established between the cyberbullies" and Plaintiff D.W.M., and that the claim that the staff members were told to oversee the students "is patently false."  (*Id.* ¶ 126.)  Plaintiffs further assert that the School Defendants knew that the perpetrators "who transmitted messages of hate and violence to D.W.M. would be free to harass, threaten, and create harm [to] Plaintiff D.W.M. without consequence and thereby create[d] and maintain[ed] a hostile learning and education environment for [] Plaintiffs D.W.M. and D.D.M." (*Id.* ¶ 129.)  Even assuming that all of Plaintiffs' assertions are true, which the Court must do, none of this suggests that the School Defendants violated the "Harassment and Bullying Policy" in the Parent-Student Handbook.

The only provision of the Parent-Student Handbook that *may* have been violated is the statement that "[a]ll children have the right to attend school in a safe, welcoming, and caring environment free from harassment and discrimination." (*Id.* ¶ 213.)  Again, Plaintiffs confront the same issue; namely, that there are no guarantees of particular action in this statement. However, the allegations in the Complaint that Plaintiffs D.W.M. and D.D.M. lived in fear and were subject to harassment and a racially hostile environment suggest that they were deprived of their right set forth in the Parent-Student Handbook.  Accordingly, Plaintiffs have made out the third element of a § 1981 claim, if barely.

Finally, in addition to Plaintiffs' failure to set forth allegations supporting the second element of a § 1981 claim, there are no allegations in the Fifth Amended Complaint that support "purposeful discrimination," as opposed to conduct that 'merely result[s] in a disproportionate impact on a particular class.'" *Juarez*, 69 F. Supp. 3d at 367 (quoting *Gen. Bldg. Contractors Ass'n, Inc.*, 458 U.S. at 291, 102 S. Ct. 3141).  There are no facts supporting an inference that the School Defendants' response would have been any different if the victim of the cyberbullying had been white, rather than black, given that Plaintiffs argue that the cyberbullies were shielded from discipline because one of their parents is a prominent figure; *not* because Plaintiffs are black.  Accordingly, Plaintiffs' § 1981 claim is dismissed.

C.  Plaintiffs' § 1983 Claim Against the School Defendants is Dismissed

Section 1983 provides in pertinent part:

> Every person who, under color of . . . [state law] subjects, or causes to be subjected, any . . . person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law[.]

42 U.S.C. § 1983.  "In other words, a § 1983 claim has two essential elements: (1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered

a deprivation of her rights or privileges secured by the Constitution or federal laws." *Lynch v. Southampton Animal Shelter Foundation, Inc.*, 971 F. Supp. 2d 340, 348 (E.D.N.Y. 2013) (quoting *Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998)).

In their motion to dismiss, the School Defendants argue that there has been no state action in this case. "To constitute state action, there must be an alleged deprivation of a federal right 'caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible[.]" *Dawkins v. Biondi Education Ctr.*, 164 F. Supp. 3d 518, 524 (S.D.N.Y. 2016) (*Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937, 102 S. C.t 2744 (1982)). "Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character that it can be regarded as governmental action." *Rendell-Baker v. Kohn*, 457 U.S. 830, 847, 102 S. Ct. 2764 (1982) (internal quotation marks omitted). A private entity does not become a state actor merely on the basis of "the private entity's creation, funding, licensing, or regulation by the government." *Cranley v. Nat'l Life Ins. Co. of Vt.*, 318 F.3d 105, 112 (2d Cir. 2003). To establish that a private actor's conduct is state action, a plaintiff "must demonstrate that the State was involved in the specific activity giving rise" to the plaintiff's cause of action; it is not enough for the State to be involved in "some activity" of the private entity that allegedly injured the plaintiff. *Dawkins*, 164 F. Supp. 3d at 525.

There is "no single test to identify state actions and state actors," *Cooper v. U..S Postal Serv.*, 577 F.3d 479, 491 (2d Cir. 2009) (internal quotation marks omitted), however three main tests have emerged:

> For the purposes of section 1983, the actions of a nominally private entity are attributable to the state when: (1) the entity acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the entity, the

entity is a "willful participant in join activity with the [s]tate," or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated a public function by the [s]tate," ("the public function test").

*Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296, 121 S. Ct. 924, 148 L.Ed.2d 807 (2001)); *see also Dawkins*, 164 F. Supp. 3d at 525 (quoting the same).

Notably, the question of whether a school is a state actor has been considered on numerous other occasions in the Second Circuit.  For example, in *Dawkins*, the Southern District of New York evaluated whether a "public high school with private status" that was "almost entirely" funded by the state, was a state actor when it terminated the plaintiff's employment. 164 F. Supp. 3d at 521.  The Court found that the school was not a state actor under any of the three tests because: (1) under the compulsion test, the decision to terminate plaintiff's employment was not "compelled or even influenced by any state regulation[;]" and (2) under the joint action test, the state's financial support did not affect the decision to terminate his employment; and (3) under the public function test, the school's function was not "traditionally the exclusive prerogative of the state."  *Id.* at 525–29 (internal quotation marks and citations omitted).  Likewise, in *Rendell-Baker v. Kohn*, the Supreme Court found that a nonprofit school founded as a private institution that was primarily funded by the state was not a state actor when it discharged the petitioners.  457 U.S. at 842.  The Court found that: (1) "the school's receipt of public funds does not make the discharge decision acts of the State[;]" (2) "the decisions to discharge the petitioners were not compelled or even influenced by any state regulation."  *Id.* at 839–42.  By comparison, there is precedent in the Second Circuit that charter schools are state actors for purposes of "claims address[ing] the nature and quality of education" received at such schools.  *See, e.g.*, *Scaggs v. New York Dep't of Educ.*, 2007 WL 1456221, at *13 (E.D.N.Y.

May 16, 2007) (holding that a charter school was a state actor for purposes of claims related to the "total inadequacy of a school to provide free public education to its students while receiving state funding"). Finally, the Second Circuit has previously held that a private law school was not a state actor when it disciplined two students by expelling them for scholastic deficiency. *See Grafton v. Brooklyn Law School*, 478 F.2d 1137, 1143 (2d Cir. 1973).

The Court will now apply these three tests for state action to the instant case to determine whether the School Defendants are state actors on the facts alleged for purposes of Plaintiffs § 1983 claim.

### 1. The Compulsion Test

"Even extensive regulation by the government does not transform the actions of the regulated entity into those of the government." *Dawkins*, 164 F. Supp. 3d at 525 (quoting *S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 544, 107 S. Ct. 2971, 97 L.Ed.2d 427 (1987)) (internal quotation marks omitted). Rather, "the state's regulation must actually 'evidence governmental coercion or encouragement' over the particular activity that allegedly caused the constitutional injury." *Dawkins*, 164 F. Supp. 3d at 526 (*Hamlin ex rel. Hamlin v. City of Peekskill Bd. of Educ.*, 377 F. Supp. 2d 379, 388 (S.D.N.Y. 2005)); *see also Sybalski*, 546 F.3d at 257 ("[T]he plaintiff must allege that the state was involved with the actual *activity that caused the injury* giving rise to the action." (internal quotation marks and citation omitted) (emphasis in original)).

The extent of the allegations in the Fifth Amended Complaint that the School Defendants are controlled, regulated, or supervised by the State are that the School Defendants "applied for and did and, upon information and belief, still does apply for and receive funds in the nature of 'aid' and/or 'reimbursement from the federal government of the United States and from the State

of New York as well as from other government sources, and not-for-profit organizations."  (Fifth

Am. Compl. ¶ 38.)  Likewise, Plaintiffs assert that:

> [Defendant Diocese] is organized and exists under the laws of the State of
> New York and in exercising its *Magisterium* or teaching mandate, it is
> *subject to the supervision and control of the New York State Department of*
> *Education*, and by exercising the power and authority of the State of New
> York it is a state actor acting under color of state law.

(Fifth Am. Compl. ¶ 168) (emphasis added).  Finally, Plaintiffs make a vague allusion to the

School Defendants being "under the compulsory education laws of the State of New York, acting

under the custom and color of New York State in providing compulsory education[.]"  (*Id.*

¶ 182.)  However, Plaintiffs never elaborate on how the School Defendants are "subject to the

supervision and control" of the State, nor do they provide even a scintilla of further information

suggesting that any such supervision or control relates to disciplining students.  While Plaintiffs

allege that they approached the police during the events that transpired, there is no suggestion

that the police directed the School Defendants' actions herein.  (*See id.* ¶ 242.)

In fact, on reviewing the Fifth Amended Complaint, it is apparent that Plaintiffs'

allegations regarding the School Defendants' relationship to New York State or the Federal

Government are effectively purely financial.  In addition to the generalized statement quoted

above that the School Defendants have and continue to receive funding, Plaintiffs also include a

list of grants that the New York State Education Department provides to nonpublic schools, and

the attendant requirements for grant recipients concerning after school programs, attendance,

instruction, safety equipment, and data reporting.  (Fifth Am. Compl. ¶¶ 229–237.)  However,

Plaintiffs do not indicate whether the School Defendants received these particular grants.  More

to the point, even if the School Defendants had received these grants, there is no suggestion

whatsoever that any of this funding would have dictated how the School Defendants acted or failed to act with regards to the cyberassault in question.

Since the Fifth Amended Complaint offers no allegations that the School Defendants are or were regulated by the State with regards to the specific actions at issue herein, it is not plausible that the School Defendants were "compelled or even influenced by any state regulation." *See Dawkins*, 164 F. Supp. 3d at 521. Therefore, the Fifth Amended Complaint does not contain sufficient allegations to plausibly support that the School Defendants were state actors under the compulsion test.

2.   The Joint Action Test

Plaintiffs fair no better under the joint action test. Pursuant to the joint action test, "the Court must determine whether there is a 'sufficiently close nexus between the State and the challenged action of the private entity so that the action of the latter may be fairly treated as that of the State itself." *Lynch*, 971 F. Supp. 2d at 351 (quoting *Russell v. Aid to Developmentally Disabled, Inc.*, 2013 WL 633573, at *19 (E.D.N.Y. Feb. 20, 2013) (internal quotation marks and citations omitted)). In other words, "a private actor can be found 'to act under color of state law for 1983 purposes . . . if the private party is a willful participant in a joint action with the state or its agents.'" *Anilao v. Spota*, 774 F. Supp. 2d 457, 498 (E.D.N.Y. 2011) (quoting *Dennis v. Sparks*, 449 U.S. 24, 28, 1010 s. Ct. 183, 66 L.Ed.2d 185 (1980)). "To establish joint action, a plaintiff must show that the private citizen and the state official shared a common unlawful goal; the true state actor and the jointly acting private party must agree to deprive the plaintiff of rights guaranteed by federal law." *Anilao*, 774 F. Supp.2d at 498 (quoting *Bang v. Utopia Restaurant*, 923 F. Supp. 46, 49 (S.D.N.Y. 1996)). When the extent of the relationship between the private party and the state actor is a financial one, "[t]o satisfy the joint action test, Plaintiff must show

that th[e] financial support specifically affected the decision" at issue.  *See Dawkins*, 164 F.

Supp. 3d at 521.

As discussed above, Plaintiffs' only allegations related to state action concern funding

that the School Defendants may or may not have received from New York State.  There are no

allegations that any of the funding the School Defendants received affected how the School

Defendants handled the cyberassault and disciplined the responsible students.  Likewise, the

Fifth Amended Complaint offers no allegations that Defendants were "willingly engaged in joint

action with the government" in any other way related to the cyberassult and discipline.  *See*

*Hamlin*, 377 F. Supp. 2d at 386.  Even Plaintiffs' passing reference that their request for "redress

for the wrongs done to them from the police[] that was denied; [and from] the public prosecutors,

. . . that was refused," does not suggest a "sufficiently close nexus" such that the School

Defendants' actions could be fairly treated as actions by the State itself.  (Fifth Am. Compl.

¶ 242.)  Accordingly, the School Defendants were not plausibly state actors under the joint action

test based on the allegations set forth in the Fifth Amended Complaint.

### 3.   The Public Function Test

"Lastly, Plaintiffs' claims also fail under the public function test because Defendants do

not perform a function that is 'traditionally the exclusive prerogative of the state.'"  *Dawkins*,

164 F. Supp. 3d at 529.  "That a private entity performs a function which serves the public does

not make its acts state action."  *Rendell-Baker*, 457 U.S. at 842, 102 S. Ct 2764.  This test

"focuses not on whether the activity delegated to the private entity has been regularly performed

by governments, but instead on whether the activity historically has been 'an exclusive

prerogative of the sovereign.'"  *Grogan v. Blooming Grove Volunteer Ambulance Corps*, 768

F.3d 259, 265 (2d Cir. 2014) (quoting *Horvath v. Westport Library Ass'n*, 362 F.3d 147, 151 (2d

Cir. 2004)).  "Notwithstanding the importance of public education, courts have consistently held that 'education is not considered to be exclusively the prerogative of the State.'"  *Dawkins*, 164 F. Supp. 3d at 529 (quoting *Hamlin*, 377 F. Supp. 2d at 386); *see also Rendell-Baker*, 457 U.S. at 842, 102 S. Ct. 2764 (affirming a grant of summary judgment on the basis that a school was not a state actor, and finding in part that while the "education of maladjusted high school students is a public function," these services are not the exclusive province of the State).  As discussed *supra*, a school can be a state actor when a party challenges the nature and quality of the education received.  *See, e.g.*, *Scaggs*, 2007 WL 1456221, at *13 (E.D.N.Y. May 16, 2007)

Here, the School Defendants educate elementary and middle school students.  However, Plaintiffs are suing the School Defendants based on the way they handled the cyberassault and their alleged failure to appropriately discipline the students L.M., M.M., and M.J.  As quoted above, Plaintiffs assert that the School Defendants are "performing functions traditionally exclusively reserved to the State" by "operating St. Mary School as an educational institution offering parents a way of satisfying the New York State mandate for compulsory education of minors while within the Roman Catholic elementary school system[.]"  (Fifth Am. Compl. ¶ 148.)  The precedent is clear that providing education is not an exclusively public function. Plaintiffs only challenge the School Defendants' disciplinary actions, rather than the quality of the education that Plaintiffs D.W.M. and D.D.M. were receiving at St. Mary.  The sole allegation that Plaintiffs set forth that the School Defendants are state actors is that they are operating an educational institution, which is insufficient to suggest that the School Defendants were state actors under the public function test.

Based on the foregoing, the Court concludes that the allegations in the Fifth Amended Complaint are insufficient to support that there has been state action under any of the three tests. Accordingly, the School Defendants' motion to dismiss Plaintiffs' § 1983 claim is granted.

### D.  Plaintiffs' § 1985 and § 1986 Claims Against All Defendants Are Dismissed

#### 1.  Relevant Law

Section 1985(3) provides in relevant part:

> If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).  Precedent suggests that while § 1985(3) "does not have the explicit 'state action' language like its counterpart, 42 U.S.C. § 1983, it is not inconsistent with the statutory text and legislative history to apply § 1985(3) to private conspiracies" that concern "the original purpose of the Civil Rights Act."  *Alharbi v. Miller*, 368 F. Supp. 3d 527, 567 (E.D.N.Y. 2019) (citing *United Brotherhood of Carpenters and Joiners of America v. Scott*, 463 U.S. 825, 836103 S. Ct. 3352, 77 L.Ed.2d 1049 (1983)).

"To state a cause of action under the deprivation clause of 1985(3), a plaintiff must allege (1) a conspiracy, (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, (3) an overt act in furtherance of the conspiracy, and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States."  *Uvidia v. Kohl's Dep't Stores, Inc.*, 2016 WL 5390134, at *6 (E.D.N.Y. Sept. 26, 2016) (citing *Friends of Falun Gong v. Pacific Cultural Enter., Inc.*, 288 F. Supp. 2d 273, 279

(E.D.N.Y. 2003)).  A private conspiracy claim under the deprivation clause of § 1985(3)

requires: (1) interference with a plaintiff's constitutional rights that are protected against private,

as well as official, encroachment; and (2) "some racial, or perhaps otherwise class-based,

invidiously discriminatory animus behind the conspirator's action.'" *Zhang Jingrong v. Chinese*

*Anti-Cult World Alliance*, 311 F. Supp. 3d 514, 551 (E.D.N.Y. 2018) (quoting *Jews for Jesus,*

*Inc. v. Jewish Community Relations Council of New York, Inc.*, 968 F.2d 286, 290–91 (2d Cir.

1992)); *Kwas v. Intergraph Gov't Solutions*, 2016 WL 4502039, at *5 (E.D.N.Y. Aug. 24, 2016).

A private conspirator must "do more than merely be aware of a deprivation of right that he

causes, and more than merely accept it; he must act at least in part for the very purpose of

producing it." *Zhang Jingrong*, 311 F. Supp. 3d at 551 (quoting *Bray v. Alexandria Women's*

*Health Clinic*, 506 U.S. 263, 278, 113 S. Ct. 753, 122 L.Ed2d 34 (1993)).  In other words, [i]n

order to allege a private conspiracy, 'a plaintiff must show that the defendants entered into some

express or tacit agreement to achieve the unlawful end.'" *Murray v. New York City Dep't of*

*Corrections*, 2016 WL 11395007, at *10 (E.D.N.Y. Aug. 18, 2016) (quoting *Webb v. Goord*, 340

F.3d 105, 110–11 (2d Cir. 2003)).

> 2.   The Parties' Arguments

Here, Plaintiffs' allegations regarding a conspiracy are confusing at best.  In the

background section of the Fifth Amended Complaint titled, "The Conspiracy and Cover-Up,"

Plaintiffs state that student L.M. "is being protected from disciplinary action and removal from

contact with Plaintiff D.W.M. because of the position and status of his parents and family."

(Fifth Am. Compl. ¶ 133.)  In the same section, Plaintiffs explain that the School Defendants are

allegedly "attempting to protect the image of St. Mary School and prevent damage to its 'we

follow Christian values' reputation by refusing to address the problem of overt racism and racial

hatred among student at the school[.]"  (*Id.* ¶ 134.)  There are no further details in the fact

sections about the nature, the aim, or the specifics of the conspiracy.

In the later section setting forth Plaintiffs' § 1985 claim, Plaintiffs allege that

"Defendants, individually and/or collectively, jointly and/or severally, conspired to deprive

Plaintiff D.W.M., a black African America man and a duly enrolled graduating Eighth Grader at

St. Mary School of his fundamental natural and civil rights which caused him serious and

permanent injury and emotional damage."  (*Id.* ¶ 243.)  Plaintiffs also state that "Defendants . . .

did conspire to deprive Plaintiff D.W.M. . . . of his right to a canonically proper Catholic

education set forth in the mission and vision statements of the [School Defendants] which

establish the contract for education between the Plaintiff Ursula Moore and Plaintiff Willie

Moore as the parents and guardians of the infant Plaintiff D.W.M. and Plaintiff D.D.M. and [the

School Defendants.]"  (*Id.* ¶ 249.)  Plaintiffs further assert that "the conspiracy among the

Defendants . . .was motivated by racial invidious discriminatory animus and all of the

Defendants knew or should have known of the racist motivated cyberattack and cyberassaults

upon the civil rights and liberty interests of Plaintiff D.W.M."  (*Id.* ¶ 244.)  Plaintiffs claim that

the Defendants had an affirmative duty to protect Plaintiff D.W.M. from any racist motivated

cyberattack and cyberassault.  (*Id.* ¶¶ 246–248.)  Finally, Plaintiffs describe that "the parents of

the students who mounted the cyberassaults upon Plaintiff D.W.M. are prominent persons and

that there was a collective failure to act[,] albeit there was a known harm, *potentially a crime*,

that occurred to which the Defendants . . . in providing compulsory education, are collectively

indifferent."  (Fifth Am. Compl. ¶ 241) (emphasis added).

The School Defendants argue that Plaintiffs have failed to state a claim upon which relief

can be granted because "claims arising under Section 1985 and 1986" require state action in the

same manner as a claim brought under Section 1983.  (School Def.'s Mem. in Supp. at 6–7.)
Defendants Krzystof and Dorota Mars, as the parents and natural guardians of M.M., argue that
"there are no allegations that neither infant M.M. nor his Defendant parents specifically violated
any Civil Rights Act provisions[.]"  (Mars Def.'s Mem. in Supp. [ECF No. 75-2] at 3.)
Defendants Michael and Christine Jones, as the parents and natural guardians of M.J., argue that
"regarding the conspiracy contention, Plaintiffs assert conclusory allegations that one of the
students was being protected by the school due to his parents' status in the community . . . [and]
these assertions do not involve the Jones Defendants and, therefore, the claims under sections
1985 and 1986 cannot survive."  (Jones Def.'s Mem. in Supp. [ECF No. 76-3] at 7.)  Finally,
Defendant Kerri Lechtrecker, as the parent and natural guardian of L.M., argues that "the
allegations regarding conspiracy are . . . bare assertions and conclusory statements masquerading
as factual allegations" and that there could not be "any reasonable inference that infant L.M. or
his mother [] somehow orchestrated a vast conspiracy between the police, the U.S. Department
of Education, and the district attorney's office . . . to decline to take action because of Defendant
Lechtrecker's supposed prominence."  (Lechtrecker Def.'s Mem. in Supp. [ECF No. 77-1] at 5.)

     3.  Plaintiffs' § 1985 Claim is Dismissed

As an initial matter, the School Defendants' argument that Plaintiffs' § 1985 claim must
be dismissed because the School Defendants are not state actors is unavailing.  As discussed
above, Section 1985 applies to private conspiracies that concern "the original purpose of the
Civil Rights Act."  *See Alharbi*, 368 F. Supp. 3d at 567.

Here, Plaintiff has alleged the first element of a § 1985(3) claim by asserting that there
has been a conspiracy between Defendants to interfere with Plaintiffs' ability to contract with the
School Defendants for a Catholic education.  (Fifth Am. Compl. ¶ 249.)  As to the second

element, Plaintiffs allege that "Defendants collectively subjected Plaintiff D.W.M. to a racially hostile environment whereby he was unable to obtain a Catholic School education and enjoy the contractual relationship for a Catholic School education on equal grounds as the white students who attended St. Mary School.  (*Id.* ¶ 72.)  There are no allegations suggesting that Plaintiff D.W.M. was unable to graduate from St. Mary School, or was forced to transfer to another school.  However, Plaintiffs do claim that Plaintiff D.W.M. lived in fear for his life while at school, which could interfere with his ability to learn and take advantage of educational opportunities.  (*Id.* ¶ 95.)  Moreover, Plaintiffs assert that "the racist motivated cyberattack and cyberassaults on [] Plaintiff DW.M. will make it necessary for [Plaintiff D.D.M.] to leave St. Mary School and attend another elementary school in a different area."  (*Id.* ¶ 30.)  This is sufficient at this stage in the pleadings.  As to the third element, Plaintiffs allege an overt act in furtherance of the conspiracy insomuch as the School Defendants refused to expel the responsible students, failed to separate these students from Plaintiff D.W.M., and failed to put in place adequate protections despite the threats of physical violence inherent in the cyberassault.  Finally, Plaintiffs have alleged the deprivation of a right or privilege of a citizen of the United States as described *supra*.  Therefore, Plaintiffs have alleged a prima facie claim under the deprivation clause of § 1985(3).  However, the Court's inquiry does not end here because Plaintiffs allege a private conspiracy.

As to the elements of a private conspiracy, there are no facts suggesting racial animus on the part of the School Defendants.  Rather the facts set forth in the Fifth Amended Complaint focus exclusively on the School Defendants' desire to protect the prominent parent, and such Defendants resulting failure to discipline the perpetrators.  The sole allegation that Defendants were motivated by "racial invidious discriminatory animus" is nothing more than a conclusory

statement.  (Fifth Am. Compl. ¶ 244.)  There is no discussion whatsoever of any of the School

Defendants making racially discriminatory remarks or a history of racism at St. Mary, nor are

there any facts suggesting that white victims of bulling have been or would be treated any

differently than African American students.  This same defect also exists with regards to a

meeting of the minds.  There are no allegations in the Complaint "supporting a meeting of the

minds," "such that [the] defendants entered into an agreement, express or tacit, to achieve the

unlawful end." *Arroyo-Horne v. City of New York*, 2019 WL 3428577, at *5 (E.D.N.Y. July 30,

2019).  Accordingly, Defendants' motions to dismiss Plaintiffs' § 1985 claim are granted.

### 4.  Plaintiffs' § 1986 Claim is Dismissed

Section 1986 imposes liability on parties who know "of the wrongs [defined by § 1985]

conspired to be done . . . and having power to prevent or aid in preventing . . . neglect[] or

refuse[] to do so." *McGrath v. Arroyo et al.*, 2019 WL 3754459, at *10 (E.D.N.Y. Aug. 8, 2019)

(quoting 42 U.S.C. § 1986) (internal quotation marks omitted).  "[A] § 1986 claim is contingent

upon a valid § 1985 claim. *McGrath*, 2019 WL 3754459 at *10 (quoting *J.L. v. E. Suffolk Boces*,

113 F. Supp. 3d 634, 647 (E.D.N.Y. 2015) (internal quotation marks and citations omitted).

Because Plaintiffs failed to allege a valid § 1985 claim, their § 1986 claim also fails.  As such,

Defendants' motions to dismiss Plaintiffs' § 1986 claim are granted.

### E.  Plaintiffs' § 2000a Claim Against Defendant St. Mary School Is Dismissed

Section 2000a provides that "[a]ll persons shall be entitled to the full and equal

enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any

place of public accommodation, as defined in this section, without discrimination or segregation

on the ground of race, color, religion, or national origin."  42 U.S.C. § 2000a(a).  Section

2000a(b) defines places of public accommodation as "establishments affecting interstate

commerce or supported in their activities by State action as places of public accommodation; lodgings; facilities principally engaged in selling food for consumption on the premises; gasoline stations; places of exhibition or entertainment; other covered establishments[.]" *Id.* § 2000a(b). Section 2000a(b) then provides a more specific list of public accommodations, none of which include schools. *Id.* Section 2000a(e) specifically provides that this subchapter does not apply to "a private club or other establishment not in fact open to the public, except to the extent that the facilities of such establishment are made available to the customers or patrons of an establishment within the scope of subsection (b)." *Id.* § 2000a(e).

It is well-established precedent in the Second Circuit that schools are not places of public accommodation. "Public schools do not purport to be open to the general public in the ways, that for example, hotels, restaurants, and movie theaters (all establishments explicitly covered by Title II) do." *Gilmore v. Amityville Union Free School Dist.*, 305 F. Supp. 2d 271, 278–79 (E.D.N.Y. 2004) (internal quotation marks and citations omitted); *see also Rodriguez v. Boursiquot*, 2009 WL 3806260, at *4 n.4 (S.D.N.Y. Nov. 12, 2009) ("Public schools are not among the establishments identified in Title II as places of public accommodation"). If public schools are not places of public accommodation, then certainly the same must be true of a private, Catholic school. *See Deberry v. Davis*, 2010 WL 1610430, at *3 (M.D.N.C. Apr. 19, 2010) (quoting *Runyon v. McCrary*, 427 U.S. 160, 172 n.10, 96 S. Ct. 2586, 49 L.Ed.2d 415 (1976)) ("Title II of the Civil Rights Act of 1984 [i.e., § 2000a] . . . does not by its terms reach private schools"). Accordingly, the School Defendants' motion to dismiss Plaintiffs' § 2000a claim is dismissed.

F.  The Motion to Dismiss Plaintiffs' § 2000d Claim Against the School Defendants Is Denied

1.  Relevant Law

Section 2000d provides that "no person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.  Under § 2000d, "teachers, administrators, and boards of education can be liable for student-on[-]student racial harassment if their deliberate indifference to racial harassment can be interpreted as discriminatory."  *HB v. Monroe Woodbury Cent. School Dist.*, 2012 WL 4477552, at *14 (S.D.N.Y. Sept. 27, 2012) (quoting *Faccio v. Eggleston*, 2011 WL 3666588, at *9 (N.D.N.Y. Aug. 22, 2011)) (internal quotation marks omitted).  To plead a deliberate indifference claim under Title VI, "the plaintiff must allege facts demonstrating that the school (1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment that was so severe, pervasive and objectively offensive that it (4) deprived the victim of access to the educational benefits or opportunities provided by the school."  *HB*, 2012 WL 4477552, at *14 (quoting *DT v. Somers Cent. Sch. Dist.*, 588 F. Supp. 2d 485, 493 (S.D.N.Y. 2008), *aff'd*, 348 F. App'x 697 (2d Cir. 2009)).  "'Deliberate indifference may be found both when the defendant's response to known discrimination is clearly unreasonable in light of the known circumstances' or 'when remedial action only follows after a lengthy and unjustified delay.'"  *TC v. Valley Cent. School Dist.*, 777 F. Supp. 2d 577, 596 (S.D.N.Y. 2011) (quoting *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 751 (2d Cir. 2003)).  "The deliberate indifference must, at a minimum, cause [the student] to undergo harassment or make [the student] liable or vulnerable to it."  *TC*, 777 F. Supp. 2d at 596 (quoting *Davis Next Friend LaShonda D. v. Monroe County Bd. of Educ.*, 526 U.S. 629, 645, 119 S. Ct. 1661, 143 L.Ed.2d 839 (1999)).  While "courts

should avoid second guessing school administrators' decision[s] and should defer to the judgment of those administrations that are important to the 'preservation of order in the schools,'" *TC*, 777 F. Supp. 2d at 596 (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 342 n. 9, 105 S. Ct. 733, 83 L.Ed.2d 270 (1985)), "deliberate indifference will often be a fact-based question, for which bright lines rules are ill-suited." *TC*, 777 F. Supp. 2d at 596 (quoting *Doe ex rel. Doe v. Derby Bd. of Educ.*, 451 F. Supp. 2d 438, 447 (D. Conn. 2006)).

>       2. The Motion to Dismiss Plaintiffs' § 2000d Against the School Defendants Is Denied

Plaintiffs have set forth a prima facie claim under § 2000d.  As to the first element of a § 2000d claim, Plaintiffs allege that the School Defendants had actual knowledge of the cyberattack given that they were apparently informed by Plaintiffs D.W.M. and Ursula Moore about such cyberattack on multiple occasions.  (Fifth Am. Compl. ¶¶ 112, 117.)  Furthermore, the School Defendants were supposedly given proof of the offending images, and they responded to the allegations by conducting their own investigation and issuing a letter summarizing their responsive actions.  (*Id.* ¶¶ 113, 118.)  As to the second element, Plaintiffs have alleged sufficient facts that the School Defendants were deliberately indifferent and that their response to the known discrimination was unreasonable in light of Plaintiff D.W.M.'s fear for his life and the assertion that no meaningful separation of the perpetrators from the infant Plaintiffs ever occurred.  (*Id.* ¶ 126.)  Plaintiffs also claim that this same failure caused Plaintiff D.W.M. to be "liable or vulnerable" to continued harassment.  *See TC*, 777 F. Supp. 2d at 596.  Regarding the third and fourth elements, the alleged cyberassault was sufficiently severe, pervasive, and objectively offensive that it "deprived the victim of access to the educational benefits or opportunities provided by the school."  *HB*, 2012 WL 4477552, at *14.  As a result of the cyberassault and the shocking images perpetrated by the students L.M., M.J., and M.M., Plaintiff

D.W.M. states that he lived in fear of being killed and was unable to enjoy the educational benefits of St. Mary School. Moreover, Plaintiff D.D.M. was apparently forced to transfer to a different school. While Courts should not second-guess school administrators' disciplinary decisions, this does not give the School Defendants carte blanche to fail to take any meaningful action in response to a disturbing racial attack that supposedly threatened violence. Accordingly, the School Defendants' motion to dismiss is denied as to Plaintiffs' § 2000d claim. The Court notes that any § 2000d brought by Plaintiffs Ursula and/or Willie Moore cannot stand as a matter of law because they are not students and therefore a student-on-student harassment claim would not apply to them.

G.  Defendants' Motions to Dismiss Plaintiffs' State Law Claims Are Denied

Plaintiffs assert the following five state law claims: (1) negligence against the School Defendants; (2) intentional infliction of emotional distress ("IIED") against all Defendants; (3) negligent infliction of emotional distress ("NIED") against all Defendants; (4) prima facie tort against all Defendants; and (5) breach of contract against the School Defendants. As to the first and fifth state law claims, which are brought solely against the School Defendants, the School Defendants have not presented any arguments in opposition to these claims. Accordingly, any motions to dismiss the first and fifth state law claims are denied.

1.  The Motions to Dismiss Plaintiffs' IIED Claim Against All Defendants Are Denied in Part and Granted in Part

To state a claim for IIED under New York law, a Plaintiff must show "(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Rich v. Fox News Network, LLC*, 322 F. Supp. 3d 487, 498 (S.D.N.Y. 2018) (quoting *Friedman v. Self Help Cmty. Servs., Inc.*, 647 F. App'x 44, 47 (2d Cir.

2016)).  "To form the basis of an IIED claim, the conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Rich*, 322 F. Supp. 3d at 498 (quoting *Howell v. New York Post Co.*, 81 N.Y.2d 115 (1993)).  "This standard . . . is rigorous and difficult to satisfy." *Rich*, 322 F. Supp. 3d at 498 (quoting *Conboy v. AT&T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001)) (internal quotation marks and citations omitted).

As to the first element of an IIED claim, the images that the perpetrators apparently created and circulated constitute, which are included in the Fifth Amended Complaint, constitute extreme and outrageous conduct because they meet the threshold at this stage in the pleadings of "utterly intolerable in a civilized society" on their face.  *See Rich*, 322 F. Supp. 3d at 498. Regarding the second element, the alleged facts suggest an intent to cause severe emotional distress given that these images were supposedly sent to Plaintiff D.W.M. to encourage him to commit suicide, and to threaten death by lynching, hanging, and other torture.  As to the third element, there is a plausible causal connection between the conduct and the injury because Plaintiff D.W.M. asserts that these images resulted in his loss of educational benefits due to his terror of being killed when he was on school premises.  As to the final element, Plaintiffs has sufficiently alleged that Plaintiff D.W.M. experienced severe emotional distress.  (*See, e.g.*, Fifth Am. Compl. ¶ 100 ("To Plaintiff D.W.M., a black African American adolescent boy there is no other meaning to the cyberassault image . . . than an overt threat of violent death"); ¶ 293 ("mental and emotional stress, emotional and psychological harm"); ¶ 294 ("psychological and physical symptoms manifesting therefrom").)  Accordingly, Plaintiffs have set forth an IIED claim with regards to Plaintiff D.W.M.

On the other hand, there are no allegations in the Fifth Amended Complaint supporting an IIED claim with regards to Plaintiff D.D.M or Plaintiffs Ursula and Willie Moore as individuals.  While the conduct at issue is plausibly extreme and outrageous, there are no allegations suggesting that it was directed in any way toward such Plaintiffs and Plaintiffs cite to no authority that would support an inference that the infant Defendants intended to cause or recklessly disregarded the probability of causing severe emotional distress to such Plaintiffs.  Accordingly, the IIED claim is dismissed as it was brought by Plaintiffs D.D.M, and Plaintiffs Ursula and Willie Moore as individuals.

Additionally, the two students who "merely reposted" the images ask that their conduct be considered separately from the conduct of the student who created the images.  The Court is unpersuaded by this argument.  The Fifth Amended Complaint asserts that all three of the students were involved in creating the images, and that the infant L.M. said as much in his admission to the School Defendants.  (Fifth Am. Compl. ¶ 116.)  Moreover, the infant M.M. allegedly did more than re-post the images; he attached them to a school e-mail under the false premise that these images were needed for a school project.  (*Id.* ¶ 110.)  Accordingly, the I.I.E.D. claim against defendants Mike and Christine Jones, as parents and natural guardians of M.J., and Krzysztof and Dorota Mars as the parents and natural guardians of M.M., remain.[3]

Finally, there are no allegations in the Complaint that support an IIED claim against the School Defendants or against Defendants Mike and Christine Jones, Krzysztof and Dorota Mars, or Kerri Lechtrecker as individuals.  None of these Defendants created or circulated the images, which is the only alleged conduct that is plausibly sufficiently extreme and outrageous to support

---

[3] The parents and guardians of the infants L.M., M.M., and M.J. are the proper parties because N.Y. C.P.L.R. § 1201 requires that "an infant shall appear by the guardian of his property, or if there is no such guardian, by a parent having legal custody[.]"  N.Y. C.P.L.R. § 1201 (McKinney).

an IIED claim.  While the School Defendants have failed to raise this argument themselves, the

Court *sua sponte* dismisses the IIED claim as it is brought against them.

> 2. The Motions to Dismiss Plaintiffs' NIED Claim Against All Defendants Are
> Granted as to Defendants Kerri Lechtrecker, Mike and Christine Jones, and
> Krzysztof and Dorota Mars

"A claim for negligent infliction of emotional distress under New York law requires

showing a breach of a duty of care resulting directly in emotional harm . . . even though no

physical injury occurred, as long as the mental injury [is] a direct, rather than a consequential,

result of the breach, and the claim . . . possess[es] some guarantee of genuineness." *Royce*

*Corley et al. v. Cyrus R. Vance, Jr. et al.*, 2019 WL 3841939, at *8 (S.D.N.Y. Aug. 15, 2019)

(quoting *Mortimer v. City of New York*, 2018 WL 1605982, at *27 (S.D.N.Y. Mar. 29, 2018)_

(alterations in original).  This is not a "bystander duty" case, as it does not involve the

"contemporaneous observation of serious physical injury or death inflicted by the defendant[s']

conduct on a member of the plaintiff's immediate family in his or her presence." *See Chau v.*

*Donovan*, 357 F. Supp. 3d 276, 289 (S.D.N.Y. 2019) (quoting *Baker v. Dorfman*, 239 F.3d 415,

421 (2d Cir. 2000)) (internal quotation marks omitted).  As such, the plaintiffs must show that

the defendants had a direct duty that "must be specific to the plaintiff[s], and not some

amorphous, free-floating duty to society." *Chau*, 357 F. Supp. 3d at 289 (quoting *Mortise v.*

*U.S.*, 102 F.3d 693, 696 (2d Cir. 1996)).  "New York courts have expressed a 'longstanding

reluctance to recognize causes of action for negligent infliction of emotional distress, especially

in cases where the plaintiff suffered no independent physical or economic injury.'" *Corley*, 2019

WL 3841939, at *8 (quoting *Colo. Capital Invs., Inc. v. Owens*, 304 F. App'x 906, 908 (2d Cir.

2008)).

Here, Plaintiffs have not alleged any specific duty that any of the non-School Defendants

owe to any of the Plaintiffs.  The extent of Plaintiffs' NIED claim is that

> Defendants, individually and/or collectively, jointly and/or severally, acted
> outrageously and beyond the bounds of decency in allowing, permitting,
> and facilitating an unprovoked and unjustified racist cyberattack and
> cyberassaults upon the civil rights and liberty interests of Plaintiff D.W.M.
> which results in emotional and physical harm to said Plaintiff and caused
> him and his family to suffer pain, shame, humiliation, and anguish.

(Fifth Am. Compl. ¶ 283.)  This is entirely insufficient to state a claim for NIED.  Accordingly,

the motions to dismiss Plaintiffs' NIED claim are granted as such claim is brought against Kerri

Lechtrecker, Mike and Christine Jones, and Krzysztof and Dorota Mars.  The School Defendants

have not made a motion to dismiss the NIED claim, therefore, such claim remains as it is

asserted against them.

### 3.   The Motions to Dismiss Plaintiffs' Prima Facie Tort Claim Against All Defendants Are Granted As To All Defendants

To state a claim for prima facie tort under New York law, a plaintiff must plead:

"(1) intentional infliction of harm, (2) causing special damages, (3) without excuse or

justification, and (4) by an act or series of acts that would otherwise be lawful."  *Katz v.

Travelers*, 241 F. Supp. 3d 397, 405 (E.D.N.Y. 2017) (citing *Restis v. Am. Coal Against Nuclear

Iran, Inc.*, 53 F. Supp. 3d 705, 730 (S.D.N.Y. 2014)).  "The first element requires 'disinterested

malevolence,' which means that the plaintiff cannot recover unless the defendant's conduct was

not only harmful, but done with the sole intent to harm."  *Katz*, 241 F. Supp. 3d at 405 (quoting

*Hall v. City of White Plains*, 185 F. Supp. 2d 293, 304 (S.D.N.Y. 2002)) (internal quotation

marks and citations omitted).  Moreover, special damages—"a critical element of the cause of

action—are damages that are alleged with sufficient particularity to identify actual losses and

[that are] related causally to the alleged tortious acts." *Barone v. United States*, 2016 WL 2658174, at *4 (S.D.N.Y. May 5, 2016).

Here, the Court need not consider whether Plaintiffs have made out the elements of a prima facie tort claim because they have failed to plead any kind of special damages against any of the Defendants.  Rather, Plaintiffs merely state that the conduct in dispute caused Plaintiff D.W.M. and his family "to suffer pain, shame, humiliation, and anguish."  (Fifth Am. Compl. ¶ 285.)  Later on, the Fifth Amended Complaint sets forth a claim for damages that includes "limitations on the educational progress of Black students," "mental and emotional distress, emotional and psychological harm, possible stunting of developmental growth, loss of self-esteem, severe anxiety, physical injuries, trauma, depression, loss of academic and future opportunities, public stigma, personal humiliation, social degradation," "short and long term negative effects on their physical, mental, and emotional health and well-being[,]" "and loss of the valuable and priceless educational well-being to which [Plaintiff D.W.M.] is entitled as a child in the United States."  (*Id.* ¶¶ 293–95.)  These are not sufficiently specific nor pecuniary, and do not constitute special damages.  *See Kuklachev v. Gelfman*, 600 F. Supp. 2d 437, 478–79 (E.D.N.Y. 2009) ("'Special damages' is defined as a specific and measurable loss,' . . . and must be alleged with sufficient particularity to identify actual [losses] and be related causally to the alleged tortious acts"); *see also Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 179 (2d Cir. 2000) (explaining that special damages related to harm to a reputation "consist of the loss of something having economic or pecuniary value which must flow directly from the injury to reputation caused by the defamation") (internal quotation marks omitted).  As special damages are a critical element of a prima facie tort claim, Defendants' motions to dismiss such claim are granted.  Again, the Court also dismisses the prima facie tort claim as it is brought against the

School Defendants *sua sponte*, given that the Fifth Amended Complaint is utterly devoid of any allegations of special damages.

## CONCLUSION

For the foregoing reasons, Defendants' Rule 12(b)(6) motions to dismiss are granted in part and denied in part.  The Rule 12(b)(1) motions to dismiss are denied.  The Plaintiffs' claims now stand as follows:

(1) Plaintiffs' claim for violations of 42 U.S.C. § 1981 by the School Defendants is dismissed in its entirety;

(2) Plaintiffs' claim for violations of 42 U.S.C. § 1983 by the School Defendants is dismissed in its entirety;

(3) Plaintiffs' claims for violations of 42 U.S.C. §§ 1985 and 1986 by all Defendants are dismissed in their entirety;

(4) Plaintiffs' claim for violations of 42 U.S.C. § 2000a by the School Defendants is dismissed in its entirety;

(5) Plaintiffs' claim for violations of 42 U.S.C. § 2000d by Defendant St. Mary School remains, but only as it is brought by Plaintiffs D.W.M., D.D.M, and Ursula and Willie Moore on behalf of their infant children; Plaintiffs' claim for violations of § 2000d is dismissed as it is brought by Plaintiffs Ursula and Willie Moore as individuals;

(6) Plaintiffs' claim for negligence against the School Defendants remains;

(7) Plaintiffs' claim for IIED is dismissed as to the School Defendants and Defendants Mike and Christine Jones, Krzysztof and Dorota Mars, and Kerri Lechtrecker as individuals, and as it is brought by Plaintiffs D.D.M. and Plaintiffs Ursula and Willie Moore as individuals; Plaintiff D.W.M.'s, and Plaintiffs Ursula and Willie Moore as parents of D.W.M.'s, IIED claim against Defendants Mike and Christine Jones as parents of infant M.J., Krzysztof and Dorota Mars as parents of infant M.M., and Kerri Lechtrecker as the parent of infant L.M. remains;

(8) Plaintiffs' NIED claim is dismissed against Defendants Mike and Christine Jones, individually and as parents of infant M.J., Krzysztof and Dorota Mars, individually and as parents of infant M.M., and Kerri Lechtrecker, individually and as the parent of infant LM.; Plaintiffs' NIED claim against the School Defendants remains;

(9) Plaintiffs' prima facie tort claim against all Defendants is dismissed in its entirety; and

(10) Plaintiffs' breach of contract claim against the School Defendants remains.

The Clerk of Court is directed to terminate Defendants Mike and Christine Jones, Krzysztof and

Dorota Mars, and Kerri Lechtrecker as individual parties to this action.

**SO ORDERED.**

Dated: Central Islip, New York
August 27, 2019

_____/s/_____
Denis R. Hurley
United States District Judge